Ben R. Stein and Sylvia Stein v. Commissioner. Harold Hibbard and Ethel Hibbard v. Commissioner.
Stein v. Comm'r
Docket Nos. 2734-66, 4312-66, 2104-67, 4602-67, 2864-70. United States Tax Court
T.C. Memo 1972-140; 1972 Tax Ct. Memo LEXIS 114; 31 T.C.M. (CCH) 663; T.C.M. (RIA) 72140; June 29, 1972, Filed *114 Jackson L. Boughner, 135 S. LaSalle, Chicago, Ill., attorney for petitioners in Docket Nos. 2734-66, 4312-66, 2104-67 and 2864-70, Ben R. Stein and Sylvia Stein. Ira M. Burman, attorney for petitioners in Docket No. 4602-67, Harold Hibbard and Ethel Hibbard. Rex A. Guest, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the Federal income tax and additions to tax for petitioners Ben R. Stein and Sylvia Stein for the calendar years 1958 through 1963 as follows: 665 Additions to
Tax Under
Docket No.
Year
Deficiency
Sec. 6653(d)
4312-66
1958
$ 13,949.60
$ 6,974.80
2864-70
1959
70,063.71
35,031.85
2864-70
1960
35,252.95
17,626.48
4312-66
1961
12,638.31
11,117.16
2734-66
1962
169,440.38
84,202.19
2104-67
1963
146,736.51
73,368.25 Respondent determined deficiencies in the Federal income tax and additions to tax for petitioners Harold Hibbard and Ethel Hibbard for the calendar years 1958 and 1961 as follows: Additions to
Tax Under
Docket No.
Year
Deficiency
Sec. 6653(b)
4602-67
1958
$ 14,180.84
$ 7,090.42
4602-67
1961
9,560.12
4,780.06
Concessions having been made by respondent, the following issues remain for our determination in the dockets involving petitioners *115 Ben R. Stein and Sylvia Stein: 1. Whether petitioners' reported taxable distributive share of partnership income from Hibbard-Stein Enterprises was understated by the amounts of $29,187.64 and $34,716.88 for the years 1958 and 1959, respectively. 2. Whether petitioners failed to report taxable income from Hibbard Dowel Co., Inc. in the amounts of $21,485.88, $29,644.67 and $1,453.43 for the years 1959, 1960 and 1961, respectively. 3. Whether petitioners failed to report taxable income of amounts received from Metropolitan Fair and Exposition Authority as management fees of $9,922.63 and $12,108.89 for the taxable years 1961 and 1962, respectively. 4. Whether petitioners failed to report taxableincome in the amounts of $42,524.56, $25,675.42 and $10,368.36 for the taxable years 1959, 1960 and 1961, respectively, received from certain transactions recorded in Ben Stein's personal account on the books of National Maintenance Corporation. 5. Whether petitioners received taxable income for the year 1959 in the amount of $13,313.82 from National Maintenance Corp. in connection with an organization designated "Exposition Service." 6. Whether petitioners received taxable income in the taxable *116 year 1960 in the amount of $1,000 from National Maintenance Corp. in connection with a transaction involving "Ace Duct." 7. Whether petitioners received taxable income in the year 1960 in the amount of $5,000 from National Maintenance Corp. in connection with a transaction involving "Best Sanitation." 8. Whether petitioners received taxable income in the year 1962 in the amount of $31,995.61 resulting from the acquisition and withdrawal by Ben Stein of certain notes and accounts receivable from National Maintenance Corporation. 9. Whether petitioners received taxable income of $9,220.63 and $6,022.23 for the years 1962 and 1963, respectively, resulting from payments made to and forthe benefit of Ben Stein by Antional Stevedoring Service, Inc.
10. Whether petitioners received taxable income in the amounts of $47,398.57 and $12,509.31 for the taxable years 1962 and 1963, respectively, resulting from certain transactions recorded in Ben Stein's personal account on the books of National Stevedoring Service, Inc.
11. Whether petitioners received taxable income in the amounts of $28,833.52 and $48,318.81 in the taxable years 1962 and 1963, respectively, resulting from certain transactions *117 recorded in Ben Stein's personal account on the books of Midwest Maintenance Service, Inc. 12. Whether petitioners received taxable income in the amounts of $10,376.16 and $13,964.57 for the taxable years 1962 and 1963, respectively, resulting from certain expenditures made to and for the benefit of Ben Stein by Midwest Maintenance Service, Inc. 13. Whether petitioners understated capital gain reported in the taxable year 1963 by the amount of $18,960.72 resulting from the sale of capital stock of National Stevedoring Service, Inc.
14. Whether petitioners were entitled to a casualty loss deduction for the taxable year 1963 in the amount of $45,705.72 as a result of firedamage. 15. Whether petitioners are entitled to deductions as contributions in the amounts of $1,325.50, $600 and $840 for the years 1958, 1961 and 1963, respectively. 16. Whether petitioners are entitled to deductions for state sales taxes in the amounts of $250, $400, and $400 for the years 1958, 1961 and 1963, respectively. 17. Whether petitioners are entitled to deductions for medical expenses in the amounts of $1,052.25, and $945 for the years 1958 and 1961, respective. 666 18. Whether petitioners are entitled *118 to dependency exemptions for Sam Stein and Reba Stein for the years 1958, 1959 and 1960. 19. Whether petitioners are liable for the addition to tax for fraud for each of the years 1958 to 1962, inclusive. 20. Whether the period of limitations upon assessment and collection of taxes has expired for the years 1959 and 1960. Concessions also having been made by respondent in the docket involving petitioners Harold Hibbard and Ethel Hibbard, the following issues remain for our determination 1. Whether petitioners' reported taxable distributive share of partnership income from Hibbard-Stein Enterprises was understated by the amount of $29,187.64 for the year1958. [1] 2. Whether petitioners failed to report taxable income from Hibbard Dowel Co., Inc. in the amount of $14,881.32 for the year 1961. 3. Whether petitioners are entitled to a deduction of $1,140.55 for the year 1958 as a partnership ordinary loss from G.C.T. Distributors, Hammond, Indiana. 4. Whether petitioners are entitled to a deductible rental loss in the amount of $134.73 for *119 the year 1958 in connection with a frame building located at Gary, Indiana. 5. Whether petitioners incurred a deductible loss in the amount of $9,924.86 for the year 1961 relating to real property located at 116 East Oak Street, Chicago, Illinois. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Ben R. Stein and Sylvia Stein, husband and wife, resided at Chicago, Illinois at the time of the filing of their petitions in these cases. They filed their joint Federal income tax returns for the calendar years 1958 through 1963 with the district director of internal revenue at Chicago, Illinois. Petitioners Harold Hibbard and Ethel Hibbard, husband and wife, resided at Miami Beach, Florida at the time they filed their petition in this case. They filed their joint Federal income tax returns for the calendar years 1958 and 1961 with the district director of internal revenue at Chicago, Illinois. Facts Applicable to All Petitioners Ben R. Stein and Harold Hibbard formed a co-partnership under the name of "HibbardStein Enterprises" pursuant to a written partnership agreement dated July 1, 1949. Under the terms of this partnership agreement Ben R. *120 Stein and Harold Hibbard were entitled to the net profits of the partnership business in equal shares and all partnership net losses were to be borne by the parties equally. An accrual method of accounting was utillized in keeping the books of Hibbard-Stein Enterprises and in the preparation of its Federal partnership returns of income for all years material hereto. A.U.S. Partnership Return of Income (Form 1065) was filed by Hibbard-Stein Enterprises for its taxable years ending January 31, 1958, and January 31, 1959 and for its taxable period February 1, 1959 to February 28, 1959. The accounting firm of Goldstein and Co. ofChicago prepared the aforesaid partnership returns filed by Hibbard-stein Enterprises. During the years involved herein Hibbard-Stein Enterprises was engaged in the business of manufacturing wooden dowels for sale to furniture manufacturers. The partnership maintained its office and plant facilities in Chicago. The gross business receipts (gross sales) and the ordinary partnership net income reported by Hibbard-Stein Enterprises on its U.S. Partnership Return of Income (Form 1065) filed for its taxable years ending January 31, 1958 and January 31, 1959, and for *121 its taxable period February 1, 1959 to February 28, 1959 are as follows: Taxable Year
Gross
Ordinary
(Period) Ending
Receipts
Income
1/31/58
$294,802.38
$25,166.73
1/31/59
262,432.47
22,178.17
2/28/59
22,830.45
1,135.21
The Hibbards and the Steins each reported one-half of the partnership ordinary income for the partnership year ended January 31, 1958 on their 1958 joint income tax returns and each reported one-half of this partnership income for its fiscal year ended January 31, 1959 and the period February 1 to 28, 1959 on their 1959 joint income tax returns. 667 Hibbard-SteinEnterprises on its partnership returns understated its gross sales by failing to include in sales items billed to and paid for by specifically identified customers to the extent of $5,032.04, $33,397.97 and $3,683.41 for its taxable years ending January 31, 1958 and January 31, 1959 and for its taxable period ending February 28, 1959. The partnership further understated its gross sales during these years and this period by amounts which are not identifiable to specific customers in the following amounts: Taxable Year
(Period) Ending
Amount
Jan. 31, 1958
$30,768.64
Jan. 31, 1959
2,639.08
Feb. 28, 1959
473.84
Hibbard-Stein Enterprises *122 was dissolved and ceased doing business on February 28, 1959. Beginning on March 1, 1959, Hibbard Dowel Co., Inc., an Illinois corporation, succeeded to the business formerly carried on by Hibbard-Stein Enterprises and at all times material hereto continued to conduct its business operations from the same premises formerly occupied by Hibbard-Stein Enterprises. The issued and outstanding capital stock of Hibbard Dowel Co., Inc. consisted of ten shares of common stock which were held from March 1, 1959 to October 31, 1961 by thefollowing persons: Name
Number of Shares
Ben R. Stein
4
Sylvia Stein
1
Harold Hibbard
5
An accrual method of accounting and a fiscal year ending February 28 or 29 was utilized in keeping the books of Hibbard Dowel Co., Inc. and in the preparation of its Federal income tax returns for all years material hereto. Having elected to be taxed as a Small Business Corporation Under Subchapter S, I.R.C. 1954, Hibbard Dowel Co., Inc. filed a U.S. Small Business Corporation Return of Income (Form 1120-S) for each of its taxable years ending February 29, 1960 and February 28, 1961. The Federal income tax returns of Hibbard Dowel Co., Inc. were prepared by Goldstein and Co. of Chicago, *123 the same firm which prepared the Hibbard-Stein Enterprises partnership returns. On its returns filed for the taxable years ending February 29, 1960 and February 28, 1961, Hibbard Dowel Company, Inc. reported that its capital stock outstanding amounted to $1,000 as of February 29, 1960, March 1, 1960, and February 28, 1961. On its return filed for the taxable year ending February 29, 1960, Hibbard Dowel Co., Inc. reported that its taxable income amounted to $27,136.87. Additionally, it reported distributions and income with respect to its shareholders as follows: Share of
Amount
Name of
Undistributed
Taxable as
Shareholder
Dividends
Taxable Income
Ordinary Income
Harold Hibbard
$ 9,675.27
$ 3,893.16
$13,568.43
Ben Stein
5,876.31
4,978.44
10,854.75
Sylvia Stein 1,469.08
1,244.61
2,713.69
Totals
$17,020.66
$10,116.21
$27,136.87 On its return filed for the taxable year ending February 28, 1961, Hibbard Dowel Company, Inc. reported that its taxable income amounted to $31,001.75. Additionally it reported distributions and income with respect to its shareholders as follows: Share of
Amount
Name of
Undistributed
Taxable as
Shareholder
Dividends
Taxable Income
Ordinary Income
Harold Hibbard
None
$15,500.87
$15,500.87
Ben Stein
None
12,400.70
12,400.70
Sylvia Stein
None 3,100.18
3,100.18
Totals
$31,001.75
$31,001.75
The *124 Hibbards and Steins each included in their income as reported on their joint income tax returns for the calendar years 1960 and 1961 the distributions allocated to them on the corporate returns of Hibbard Dowel Company, Inc. for its fiscal yearsended February 29, 1960 and February 28, 1961. 668 Hibbard Dowel Company, Inc. reported on its returns gross business receipts for its taxable years ending February 29, 1960 and February 28, 1961 as follows: Gross Business
Taxable Year Ending
Receipts
February 29, 1960
$330,809.67
February 28, 1961
267,196.50
Hibbard Dowel Company, Inc. failed to report receipts from sales to specifically identified customers in the amounts of $50,005.46 and $7,996.60 on its Federal tax returns filed for its taxable years ending February 29, 1960 and February 28, 1961, respectively. In addition the Corporation had receipts from sales which are not identifiable to specific customers in the following amounts for the years indicated: Taxable Year Ending
Amount
February 29, 1960
$1,075.13
February 28, 1961
8,548.40
On October 31, 1961, Francis Moran acquired a one-third interest in Hibbard Dowel Company, Inc. by purchasing one and two-thirds shares of its capital stock from *125 Ben R. Stein and Sylvia Stein and one and two-thirds shares from Harold Hibbard. No change occurred in the issued and outstanding capital stock of Hibbard Dowel Company, Inc. thereafterthroughout the calendar year 1963. Frank Moran did not take an active part in the operations of Hibbard Dowel Company, Inc. prior to the time he acquired his one-third stock interest therein during October 1961. Hibbard-Stein Enterprises and Hibbard Dowel Company, Inc. will sometimes hereinafter be referred to as "Hibbard Dowel Co.", the trade name under which both entities conducted business. During the years 1957 to 1961, inclusive, Harold Hibbard worked in several capacities with the Hibbard Dowel Co. Hibbard had control over the production side of the business and also served as a salesman and made numerous trips on business matters. During these years Hibbard had no active business interests other than the Hibbard Dowel Co. Ben Stein served Hibbard Dowel Co. in the area of sales development and also participated in the general management of the business. Hibbard spent approximately 60 percent of his working time in the office of Hibbard Dowel Co. On those days when he was out of town Stein would *126 come into the office for a few hours. Occasionally both men would be in the office the same day and occasionally neither. Stein would not spend the whole day at the office butgenerally only a few hours and would then go to the company boat anchored in the harbor at Chicago. Stein usually appeared at the Hibbard Dowel Co. office about twice a week. Harold Hibbard suffered a servere heart attack on November 10, 1958. As a result of his heart attack, Harold Hibbard entered the Bethesda Hospital, Chicago, Illinois, on November 11, 1958 and was discharged on December 10, 1958. Harold Hibbard was away from work about 3 months while he convalesced. He returned to work on a part-time basis in either March or April 1959. When he first returned to work after his heart attack, Harold Hibbard worked about one-half hour a day for the first couple of weeks, then an hour a day for the next couple of weeks and thereafter gradually increased his working hours to three or four a day. Prior to his return to work after his heart attack, Harold Hibbard did not conduct any of the business affairs of Hibbard Dowel Co., nor did he have any contact with the bookkeeper, Rose Hollowbow. During Harold Hibbard's *127 absence caused by his illness Ben Stein came to the office almost every day. During the years 1957 to 1961, inclusive, Harold Hibbard was away from the City of Chicagoon out-of-town trips on the dates and at the places indicated as follows: Dates
Places
2/ 2/57 through 2/ 5/57
Philadelphia
3/15/57 through 3/22/57
Florida
4/ 7/57 through 4/27/57
Omaha, Denver, Utah, California
5/13/57 through 5/16/57
North Carolina
5/21/57 through 5/22/57
Louisiana
8/19/57 through 8/23/57
Ohio, New York
10/ 5/57 through 10/13/57
Miami
10/17/57 through 10/22/57
Texas
3/ 2/58 through 3/ 4/58
Dallas, Texas
4/7/58 through 4/11/58
Memphis; Houston, Austin and Tyler,
Texas
4/20/58 through 4/22/58
Memphis; Bull Shoals, Arkansas
5/ 4/58 through 5/14/58
Omaha, Denver, Salt Lake City, Los Angeles, San Francisco, Seattle
7/26/58 through 7/28/58
Northern Wisconsin
10/ 9/58 through 10/19/58
Miami, Tampa
10/26/58 through 10/28/58
Memphis
3/ 3/59 through 3/17/59
Cincinnati; High Point, Greensboro and Charlotte, North Carolina; Tampa; Miami; San Juan, Puerto Rico
4/12/59 through 4/17/59
Memphis, Dallas
5/10/59 through 5/21/59
Omaha, Denver, Salt Lake City, Los Angeles, San Francisco, Seattle
7/24/59 through 7/27/59
Wisconsin
9/22/59 through 9/25/59
Memphis, Mississippi
11 7/59 through 11/14/59
Miami, Tampa
12/20/59
Omaha
2/10/60 and 2/11/60
Lenoir, North Carolina
3/ 5/60 through 3/19/60
Miami, Puerto Rico
4/24/60 through 4/29/60
Houston, San Antonio, Dallas
Fort Worth
5/ 8/60 through 5/19/60
Omaha, Denver, Salt Lake City, Los Angeles, San Francisco, Seattle
7/15/60 through 7/22/60
Miami; Tampa
8/19/60 through 8/21/60
Omaha
9/25/60 through 9/29/60
Memphis, Arkansas
12/27/60 through 12/30/60
Miami
2/12/61 through 2/15/61
North Carolina
*128 All entertainment expenses incurred by Harold Hibbard during his out of town trips were included in his travel expense vouchers. Hibbard Dowel Co. employed only one person to assist the partners in the company office, Rose Hollowbow. She first began working for Hibbard Dowel Co. in 1950 and continued to work full-time there until the latter part of 1961 or early 1962. Rose Hollowbow was present in the office all of the working day. Ben Stein employed the accounting firm of Goldstein and Company in 1949 to perform the auditing and tax services for Hibbard Dowel Co. That firm continued to do so throughout the year 1961. Ben Stein dealt specifically with Robert Goldstein of that firm. Goldstein and Co. performed accounting services on a monthly basis for Hibbard Dowel Co. and in connection therewith prepared monthly financial statements, posted the general ledger accounts and reconciled the bank statements. A member of that firm would appear on the premises of Hibbard Dowel Co. at least once each month. In addition to keeping the books of Hibbard Dowel Co., Rose Hollowbow's duties included billing, typing, general stenography, and secretarial work. Rose Hollowbow performed herduties for *129 Hibbard Dowel Co. under instructions received from Harold Hibbard and occasionally from Ben Stein. The instructions she received from Hibbard generally originated with Stein, Hibbard merely passing the instructions on to her. Under the accounting and office procedures employed by Hibbard Dowel Co. relating to the sales of merchandise, Rose Hollowbow would type bills of lading covering merchandise shipped to customers and upon completion she would turn over all of the typed copies to Harold Hibbard or, in his absence, Ben Stein. Rose Hollowbow would then type the sales invoices covering sales based on the bills of lading returned to her by Harold Hibbard and Ben Stein and would type those on the invoices numbered in the series which Hibbard or Stein instructed her to use. Either Stein or Hibbard would, during the years 1957 through 1960, instruct Rose Hollowbow at times to type certain invoices on a special series of invoices, numbered 26,000. Hibbard generally gave the instructions as to the specific customers to be billed on the 26,000 series invoices but he decided on which customers to so bill on the basis of instructions received, usually by telephone, from Ben Stein.Those invoices *130 which were typed on invoices other than in the 26,000 series would be typed in triplicate. Two copies of such invoices would be sent to the customer and one would be retained in the company files. From the copy of the invoice in the company file the sale would then be charged to the customer's account receivable ledger card by Rose Hollowbow. Sales handled in this manner were fully reported on the company's income tax returns. Those sales which were billed on invoices in the 26,000 series were handled in a different manner. Rose Hollowbow would type the invoice in triplicate, send two copies to the customer and return the third copy to Hibbard or Stein. The sale would not be charged to the account of the customer on the customer's account receivable ledger card. Those invoices which were not in the 26,000 series would be filed in numerical order. Rose Hollowbow would make an adding machine tape totaling the invoices mailed each day and these would be given to the auditor at the end of each month for reconciliation. Rose Hollowbow did not post the sales account. This posting 670 was done by either Hibbard or Stein, or the auditor. The invoices in the 26,000series were kept aside by *131 Hibbard and Stein and were not filed. Neither a credit to sales nor a debit to the customer's accunt would be made with respect to such invoices. When mail was receiver by Hibbard Dowel Co., Rose Hollowbow would not open it but would deliver it sealed to either Hibbard or Stein. One of these men, generally Hibbard, would open the mail. When Hibbard opened the mail, if there were checks in it in payment of invoices in the 26,000 series, he would await instructions from Stein as to their disposition. Stein would ask as to the amount of such checks and would allow a certain amount to accumulate. When the desired amount of checks representing receipts of unreported sales (those billed on the 26,000 series of invoices) had been reached, the checks would be carried over to the offices of the National Maintenance Corp., a firm managed by Stein which operated a temporary labor furnishing business. The invoices representing these unreported sales would then be destroyed. Checks from customers who had been billed on invoices other than those in the 26,000 series (and a few in the 25,000 series) were turned over by Hibbard or Stein to Rose Hollowbow, who would makeentries in the company's cash *132 receipts journal and credit the accounts of those customers from which payment had been received. There was an account maintained on the books of Hibbard Dowel Co. designated as the "Exchange" account. Either Hibbard or Stein would sometimes give Rose Hollowbow a memorandum or oral instructions telling her to credit certain payments on the books of the Hibbard Dowel Co. to this exchange account. Occasionally Hibbard or Stein would instruct Rose Hollowbow to credit certain customer accounts when she was given no check to substantiate the amount. Rose Hollowbow would prepare an adding machine tape listing the following items: (1) the checks she had posted to customer accounts; (2) the amounts she had credited to the company's exchange account; and (3) the amounts she had credited to customer accounts which were not substantiated by a check in her possession. Rose Hollowbow would then type up a deposit slip, leaving blank the amount deposted and a list of the checks. She would type on a sheet of paper the words "as per list" and attach that paper to the adding machine tape mentioned above. She would then return the checks and the deposit slip to eitherHibbard or Stein. Rose Hollowbow *133 did not make the bank deposits. They were made either by Stein or Hibbard or a messenger sent to the bank by Stein or Hibbard. In addition to crediting the checks to the customer accounts, Rose Hollowbow would debit the cash receipts account by the same amount as the total on the adding machine tape. She did not, however, reconcile her balance of cash in bank with monthly statements from the bank. In many instances when Rose Hollowbow would be instructed by Harold Hibbard and Ben Stein to make entries in the cash receipts journal of Hibbard Dowel Co. debiting cash and crediting the "exchange" account, the source of receipts would be identified in the cash receipts journal merely by the word "deposit". Sales of merchandise by Hibbard Dowel Co. which were billed to its customers on sales invoices bearing a 26,000 series number, and certain sales invoices bearing a 25,000 series number, were not recorded as sales on the books and records of Hibbard Dowel Co., nor were they reported as sales on the partnership or corporate Federal income tax returns. The 26,000 series of invoices were obtained from the back of a stack of a supply of invoices kept onhand. National Maintenance Corp. maintained *134 two checking accounts, one with the South East National Bank of Chicago and the other with the Cosmopolitan Bank of Chicago. The account with the South East National Bank was listed under the office address of National Maintenance Corp. at 543 West Madison Street and transactions in this account were recorded on the books of National Maintenance Corp. The account at the Cosmopolitan Bank of Chicago was listed at the Hibbard Dowel Co. address and no transactions in this account were recorded on the books of National Maintenance Corp. The authorized signatures on this account were Ben Stein and Louis Novinson, president and vice president, respectively, of National Maintenance Corporation. Receipts from recorded sales to customers of Hibbard Dowel Co. were on occasion deposited into the Cosmopolitan Bank account of National Maintenance Corp. and proceeds or remittances received from customers of Hibbard Dowel Co. 671 whose sales were not recorded were credited to those customers accounts at the direction of Stein or Hibbard. Although the amount of the deposit entered in the cash receipts journal of Hibbard Dowel Co. was the same asthe total funds deposited, the checks actually deposited *135 differed for the most part as to the number of the items, amounts and sources from the entries in the cash receipts journal. As a result, the individual items on the adding machine tape that accompanied the deposit slip represented the amounts of the checks which were being deposited and did not, in every instance, correspond with the items entered as deposits in the cash receipts journal. J. L. Snyder while employed by the Internal Revenue Service in the capacity of a revenue agent investigated the Federal income tax returns filed by Ben and Sylvia Stein for the taxable years 1958 through 1961, Harold Hibbard for the taxable years 1958 through 1961, the partnership returns filed by Hibbard-Stein Enterprises for its taxable years ending January 31, 1958 and January 31, 1959 and its taxable period ending February 28, 1959 and the Federal income tax returns filed by Hibbard Dowel Co., Inc. for its taxable years February 29, 1960 and February 28, 1961. Snyder also investigated the Federal income tax returns filed by National Maintenance Corp. for its taxable years ending May 31, 1959, May 31, 1960 and May 31, 1961, and the periodup to and until the time it ceased operation in September *136 1961. Suyder was assisted in his investigation by three other revenue agents who worked under his supervision. Snyder's investigation was conducted in conjuction with that conducted by Special Agent William Ross and his assistants of the Intelligence Division, Internal Revenue Service. In connection with their investigation, which was conducted during the years 1963 and 1964, Snyder and Special Agent Ross examined the books and records of the various entities investigated which were made available to them. Their investigation also included the examination of records of third parties including customers of Hibbard Dowel Co. and National Maintenance Corp. and various banks. During its taxable year ending January 31, 1958 the "Exchange" account of Hibbard-Stein Enterprises was credited with various entries aggregating $62,544.06. Included in this amount were proceeds of both recorded and unrecorded sales received by Hibbard Dowel Co. from its customers totaling $16,605.57. Of this amount sales to specifically identified customers amounted to $1,966.65, thus leaving a balance of $14,638.92 of proceeds from both recorded andunrecorded sales not identified to specific customers. The identified *137 unreported sales credited to the exchange account on Hibbard Dowel Co.'s books for its fiscal year 1958 were $1,705.18. During its taxable year ending January 31, 1959 the "Exchange" account of Hibbard Dowel Co. was credited with various entries aggregating $102,331.54. Included in this amount were proceeds of both recorded and unrecorded sales received by Hibbard Dowel Co. from its customers totaling $20,058.67. Of this amount specific sales to specifically identified customers amounted to $16,387.30, thus leaving a balance of $3,671.37 of proceeds from both recorded and unrecorded sales not identified to specific customers. The identified unreported sales of Hibbard-Stein Enterprises credited to the "Exchange" account in its fiscal year 1959 amounted to $16,278.44. During its taxable period ending February 28, 1959 the "Exchange" account of Hibbard Dowel Co. was credited with various entries aggregating $11,631.39. Included in this amount were proceeds of both recorded and unrecorded sales received by Hibbard Dowel Co. from its customers totaling $1,550. Of this amount specific sales to specifically identifiedcustomers amounted to $1,533, thus leaving a balance of $17.00 of proceeds *138 from both recorded and unrecorded sales not identified to specific customers. The identified unreported sales of Hibbard Dowel Co. credited to the "Exchange" account amounted to $341 for the period February 1 to February 28, 1959. During its taxable year ending February 29, 1960 the "Exchange" account of Hibbard Dowel Co. was credited with various entries aggregating $94,238.61. Included in this amount were proceeds of both recorded and unrecorded sales received by Hibbard Dowel Co. from its customers totaling $32,671.40. Of this amount specific sales to specifically identified customers amounted to $31,036.24, thus leaving a balance of $1,635.16 of proceeds from both recorded and unrecorded sales not identified to specific customers. The indentified unreported sales of Hibbard Dowel Co. credited to the "Exchange" account amounted to $30,811. During its taxable year ending February 28, 1961 the "Exchange" account of 672 Hibbard Dowel Co. was credited with various entries aggregating $51,026.42. Included in this amount were proceeds of both recorded and unrecorded sales received by Hibbard Dowel Co. fromits customers totaling $16,545. Of this amount specific sales to specifically identified *139 customers amounted to $14,506.86, thus leaving a balance of $2,038.14 of proceeds from both reported and unreported sales not identified to specifiic customers. The identified unreported sales of Hibbard Dowel Co. credited to the "Exchange" account amounted to $6,384.81. The following tabulation shows in summary form the manner in which the proceeds received in payment of the identified unreported sales of Hibbard Dowel Co. for its taxable years ending January 31, 1958 and January 31, 1959 and for its taxable period February 1 to 28, 1959, were initially handled in the book intries of the partnership: Taxable Year
Taxable Year
Taxable Period
Ended
Ended
February 1 to
1/31/58
1/31/59
28, 1959
INTIAL BOOK ENTRIES
Hibbard Dowel Co. - "Accounts Receiv- able" account credited
$2,461.03
$ 5,766.83
$1,874.57
Hibbard Dowel Co. - Exchange ac- count credited
1,705.18
17,204.99
341.00
Hibbard Dowel Co. - Other
14.45
88.49
11.85
National Maintenance Corp. "Misc. Acc'ts Receivable" account credited 509.30
5,083.37
Subtotal
$4,689.96
$28,143.68
$2,227.42
NO BOOK ENTRIES
National Maintenance Corp. - Deposited in unrecorded Cosmopolitan Bank Ac- count
$ 4,885.13
$1,455.99
Customers' checks cashed
36.30
150.20
Harold Hibbard - Deposited in personal bank account
154.84
Other 150.94
218.96
Subtotal $ 342.08
$ 5,254.29
$1,455.99
Total $5,032.04
$33,397.97
$3,683.41
*140 The following tabulation shows in summary form the initial disposition of the checks received by Hibbard Dowel Co. in payment of the identified unreported sales of Hibbard Dowel Co. for its taxable years ending January 31, 1958 andJanuary 31, 1959 and for its taxable period February 1 to February 28, 1959: Taxable Year
Taxable Year
Taxable Period
Ended
Ended
Ended
Disposition
1/31/58
1/31/59
2/28/59
Deposited - Bank account of Hibbard Dowel Co. *
$4,399.89
$ 2,225.23
Deposited - Bank account of Hibbard Dowel Co. **
20,835.08
$2,227.42
Deposited - Bank account of National Maintenance Corp.
290.07
5,083.37
Deposited - Unrecorded bank account of National Maintenance Corp. **
4,885.13
1,455.99
Deposited - Bank account of Harold Hibbard
154.84
Other 187.24
369.16
Total $5,032.04
$33,397.97
$3,683.41 673 The following tabulation shows in summary form the manner in which the proceeds received in payment of the identified unreported sales of Hibbard Dowel Co. for its taxable years endingFebruary 29, 1960 and February 28, 1961 were initially handled in the book entries of the Corporation: Taxble Year
Taxable Year
Ended
Ended
2-29-60
2-28-61
INITIAL BOOK ENTRIES
Hibbard Dowel Co. - "Accounts Receivable" account credited
$10,114.15
$ 789.18
Hibbard Dowel Co. - "Exchange" Account credited
30,811.00
6,384.81
Hibbard Dowel Co. - Other
1,026.29
822.61
Subtotal $41,951.44
$7,996.60
NO BOOK ENTRIES
National Maintenance Corp. -
Deposited in unrecorded Cosmopolitan Bank account
7,590.77
Customers' checks cashed 463.25
Subtotal
$ 8,054.02
0
Total
$50,005.46
$7,996.60
The *141 following tabulation shows in summary form the initial disposition of the checks received by Hibbard Dowel Co. in payment of the identified unreported sales of Hibbard Dowel Co. for its taxable years ending February 29, 1960 and February 28, 1961: Taxable Year
Taxable Year
Disposition
ending 2/29/60
ending 2/28/61
Deposited - Bank account of Hibbard Dowel Co.
$41,951.44
$7,996.60
Deposited - Unrecorded bank account of National Maintenance Corp. *
7,590.77
Other 463.25
Total $50,005.46
$7,996.60 During the taxable year ended January 31, 1958, there were credit entries in the Miscellaneous Receivables account of National Maintenance Co. in the amount of $17,777.05 showing as the creditor Hibbard Dowel Co. whereas there were no corresponding entries on the books of Hibbard Dowel Co. showing that this money had been advanced. This amount does not include the sum of $509.30 which represents identified unrecorded sales which were initially entered on the books of National Maintenance Co. as credits to Miscellaneous Receivables. During the taxable year ended January 31, 1959, there were credit entries in the Miscellaneous Receivables account of National *142 Maintenance Co. in the amount of $6,709.88 showing as the creditor Hibbard Dowel Co. whereas there were no corresponding entries on the books of Hibbard Dowel Co. showing that this money had been advanced. This amount does not include the sum of $5,083.37 which represents identified unrecorded sales which were initially entered on the books of National Maintenance as credits to Miscellaneous Receivables. As an offset against proceeds received by Hibbard Dowel Co. from its customers in payment of unreported sales credited to its exchange account, Hibbard Dowel Co. issued checks signed by Harold Hibbard as maker and by Ben Stein as maker. Some of these checks were payable to cash and deposited in Harold Hibbard's 674 personal bank account. Some of these checks were made to National Maintenance and deposited in the unrecorded Cosmopolitan Bank account of that company and some were cashed by Harold Hibbard or Ben Stein. In some instances when a deposit of a Hibbard Dowel Co. check was made in the unrecorded Cosmopolitan Bank account of National Maintenance a check in equal amount would be drawn on that account to Ben Stein. In some instances, checks representing payments from customers *143 of Hibbard Dowel Co. who were billed on series 26,000 invoices would be deposited directly into the unrecorded Cosmopolitan Bank account of National Maintenance and an entry made on the books of Hibbard Dowel Co. debiting the bank deposit account and crediting the exchange account. Some of these checks were issued while Harold Hibbard was in the hospital recovering from a heart attack. Although Hibbard signed some checks of Hibbard Dowel Co. brought to him whenhe was in the hospital, he did not sign any checks which were to be debited to the exchange account. On January 27, 1959 Hibbard Dowel Co. issued a check payable to Ben Stein signed by Ben Stein as maker in the amount of $1,000. This check was endorsed first by Ben Stein and this endorsement was followed by the endorsement stamped thereon "Pay to the order of Pan American Bank of Miami, Florida for deposit only Ocean Ranch, Inc." Hibbard was not at work in the latter part of January 1959 but was at home recovering from his heart attack. All funds transferred from Hibbard Dowel Co. to National Maintenance Corp., including proceeds from unreported sales of Hibbard Dowel Co. were transferred at the directions and pursuant to the *144 instructions of Ben Stein. The actual checks representing unrecorded sales would often be deposited in the Hibbard Dowel Co. bank account, the amounts being credited to the accounts of customers whose purchases had been recorded. When checks from these latter customers arrived at Hibbard Dowel Co. they would be endorsed with a rubber stamp "Hibbard Dowel Company" and then sent over to National Maintenance Corp. where they again would be endorsed "National MaintenanceCorp." and deposited in an unrecorded bank account of that company with the Cosmopolitan Bank of Chicago. In the operations of its business of furnishing temporary day laborers to various Chicago businesses, National Maintenance Corp. daily required the cash necessary to pay its laborers. Ben Stein was president of National Maintenance Corp. and furnished its financing. Ben Stein at times borrowed money from Hibbard Dowel Co. for use in financing National Maintenance Corp. which was recorded on the books of Hibbard Dowel Co. as a loan and repaid. The vice president of National Maintenance Corp., Louis Novinson, at no time made a request of Harold Hibbard for an exchange of funds between Hibbard Dowel Co. and National Maintenance *145 Corp. Hibbard Dowel Co. claimed deductible automobile expenses in the following amounts for the following taxable years or periods: Taxable Year Ended
Amount
1/31/58
$2,032.65
1/31/59
1,696.17
February 1959
335.24
2/29/60
2,450.26
2/28/61
1,595.95
Petitioner Ben Stein used a company car which he drove for both business and personal use. His business trips included driving around the city of Chicago and making occasional tripsto North Carolina, Tennessee, and Florida. Stein did not own another automobile for personal use. Petitioner Harold Hibbard also used a company car for both business and personal use. His wife, petitioner Ethel Hibbard, had her own car for personal use. Hibbard would make business automobile trips to Michigan, Wisconsin, North Carolina and Arkansas. Hibbard Dowel Co. claimed deductions for boat expenses in the following amounts for the years or period indicated: Taxable Year Ended
Amount
1/31/58
$2,696.98
1/31/59
2,320.18
February 1959
67.60
2/29/60
2,673.58
2/28/61
462.66
Hibbard Dowel Co. as an organization owned a boat anchored in Chicago harbor. Petitioner Ben Stein used the boat extensively whereas petitioner Harold Hibbard used it very little. Stein used the boat for personal pleasure *146 and in two years took it to Florida for the winter months. At times Stein would have among the guests on the boat customers of Hibbard Dowel 675 Co. Hibbard Dowel Co. incurred interest expenses on amounts borrowed to purchase the boat and the company automobiles in the following amounts for the years or period indicated: Taxable Year Ended
Amount
1/31/58
$1,007.30
1/31/59
1,331.25
February 1959
91.67
2/29/60
1,294.58
2/28/61
1,062.22 Hibbard Dowel Co. claimed deductions for depreciation of the company boat and company automobiles in the following amounts for the years or periods indicated: Taxable
Year
Ended
Boat
Automobile
1/31/58
$3,242.55
$4,897.36
1/31/59
2,832.55
3,188.04
February 1959
236.05
90.62
2/29/60
2,257.17
2,047.53
2/28/61
611.32
1,688.70
Hibbard Dowel Co. incurred and deducted boat and automobile insurance expenses in the following amounts for the years or period indicated: Taxable Year Ended
Amount
1/31/59
$1,847.68
February 1959
149.87
1/28/61
1,936.52
For the fiscal year ended February 29, 1960, Hibbard Dowel Co. incurred and deducted $3,850.23 for automobile, boat and workmen's compensation insurance expenses. The records of Hibbard Dowel Co. made no segregation between the boat insurance expenses and *147 the automobile insurance expenses. No funds were disbursed by the partnership in February 1959 for automobile or boat insurance. For the taxable year ended February 28, 1961 Hibbard Dowel Co. disbursed $241.80 for automobile insurance premiums and $1,311.67 for boat insurance premiums. For the taxable year ended February 29, 1960, HibbardDowel Co. disbursed $398.75 for automobile insurance premiums, $1,146.74 for boat insurance premiums, and $2,462.15 for workmen's compensation insurance premiums. Hibbard Dowel Co. claimed deductions for bad debts in the amounts as follows for the years or period indicated: Taxable Year Ended
Amount
1/31/58
$2,357.90
1/31/59
4,693.00
2/29/60
1,299.12
2/28/61
1,334.92
During its taxable year ended January 31, 1959, one of the salesmen employed by Hibbard Dowel Co. in Puerto Rico absconded with $140.10 of the company's funds. Hibbard Dowel Co. claimed deductions for business promotion expenses in the following amounts for the years or period indicated: Taxable Year Ended
Amount
1/31/58
$6,339.85
1/31/59
5,039.61
February 1959
339.92
February 29, 1960
4,965.31
February 28, 1961
2,248.47
Ben Stein solicited new business of Hibbard Dowel Co. by calling on local accounts in Chicago. *148 When furniture shows were held in Chicago he entertained the customers of Hibbard Dowel Co. and salesmen attending the shows. Ben Stein usually entertained customers in restaurants and taverns and had bills charged to Hibbard Dowel Co. Stein also chargedsome personal meals to Hibbard Dowel Co. Facts Pertinent Only to the Steins. National Maintenance Corp. was incorporated under the laws of the State of Illinois on June 20, 1956 with an authorized capital consisting of 20 shares of common stock having a par value of $100 per share. The original incorporators were Ben R. Stein, Harold Hibbard and Louise Clemens, all of Chicago, Illinois. Samuel Wexler was named the initial registered agent of National Maintenance Corp. and the first board of directors consisted of Ben R. Stein, Samuel Wexler, and Louis Novinson. The first meeting of the board of directors of National Maintenance was held on June 20, 1956 at which time Ben Stein was chosen as chairman of the meeting and Samuel Wexler was chosen as secretary of the meeting. At that meeting a resolution was unanimously adopted authorizing the vice-president and secretary of National Maintenance to execute on behalf of the corporation *149 an agreement with Ben Stein providing in part as follows: Whereas the CORPORATION is engaged in the business of furnishing temporary labor, contract labor and personnel to various businesses, enterprises and industries, and Whereas, the capitalof this CORPORATION is limited and it is necessary for the CORPORATION to secure the necessary funds to finance the payroll payments of this type of operation, and 676 Whereas, it is necessary that the CORPORATION secure the services of a public relations man for the promotion and securing of contracts with various organizations and companies for the supplying of said personnel, and Whereas, BEN R. STEIN, agrees and is willing to finance the needs of said CORPORATION and act for and on behalf of said CORPORATION is [sic] promoting the purpose for which it has been created and act as its public relations representative, and share in its profits and losses. Now Therefore: It is mutually Agreed as follows: (1) The said BEN R. STEIN agrees to devote the necessary time or act as the public relations representantive [sic] and promotor for and on behalf of the CORPORATION to further the purpose of said CORPORATION. (2) The said BEN R. STEIN further *150 agrees to advance to the CORPORATION, during the term of this agreement, the necessary funds to finance their payroll needs not to exceed at any one time in aggregate, the sum of Fifty Thousand Dollars. ($50,000.00) (3) Theagreement shall remain in full force and effect for a period of ten years from the date of its execution unless terminated prior with the mutual consent of the parties. (4) The said BEN R. STEIN is to receive no salary during the term of this agreement and the only compensation shall be as herein provided. The agreement provided for Ben Stein's receiving compensation for his services and for financing the corporation of 50 percent of the net corporate profits for each of its fiscal years ending May 31. In addition he was to be reimbursed for expenses. The board of directors of National Maintenance Corp. was comprised of Ben Stein, Louis Novinson, and Samuel Wexler from June 20, 1956 to January 28, 1959. The officers during this same period were as follows: President
Ben R. Stein
Vice President
Louis Novinson
Secretary
Samuel Wexler
Treasurer
Ben R. Stein National Maintenance maintained a telephone in the offices of Hibbard Dowel Co. No postings or entries were made to the *151 general ledger accounts maintained by National Maintenance Corp. as part of its books of account subsequent to June 30, 1961. The company ceased doing business during September 1961and was dissolved on December 3, 1962. Harold Hibbard had no stock interest in National Maintenance Corp. nor was he an employee of that corporation. He was, however, authorized to sign payroll checks for National Maintenance on its bank account at the South East National Bank and did so on several occasions at the request of Ben Stein. Ben Stein financed the operations of National Maintenance Corp., obtained its customers and made all final decisions as to the operations of the corporation. Louis Novinson was in charge of the daily operations of National Maintenance. He recruited the workers, dispatched them, serviced accounts, ran the office and made up the daily payroll. Harold Hibbard had no business dealings with Louis Novinson during the years 1957 through 1961 except when he occasionally signed some payroll checks of National Maintenance. Louis Novinson had no interest in, nor was he associated in any way with Hibbard Dowel Co. Rose Hollobow, Harold Hibbard, and Ben Stein would answer or receive calls *152 on the telephone maintained by National Maintenance in the office of Hibbard Dowel Co. On January 12, 1960 National Maintenance opened a new and separate account withthe Cosmopolitan National Bank of Chicago, Illinois, which account remained open until January 11, 1962. Transactions involving this account, including deposits and withdrawals, were recorded on the books of account maintained by National Maintenance. Only Louis Novinson was authorized to sign checks drawn on this account. The address listed for this account was the office and business address of National Maintenance. This checking account is sometimes referred to herein as the recorded Cosmopolitan Bank account of National Maintenance. On January 5, 1960 National Maintenance Corp. opened a checking account with the Madison Bank and TrustCompany, Chicago, Illinois, under its office and business address. Louis Novinson was authorized to sign checks on this account. Transactions involving this account including deposits and withdrawals, were not recorded on the books of account maintained by National 677 Maintenance Corp. This checking account will sometimes be referred to herein as the unrecorded Madison Bank account of *153 National Maintenance Corp. National Maintenance Corp., as part of its books and records, maintained a ledger account entitled "Miscellaneous Receivables" inaddition to its regular customers' accounts receivable ledger account. National Maintenance borrowed money from time to time from The Cosmopolitan National Bank of Chicago during the period commencing January 26, 1959 and ending November 3, 1961. As collateral security therefore, National Maintenance assigned to The Cosmopolitan National Bank certain of its accounts receivable. The following is a summary of such assignments: Loan
Total Amount
Date
Number
Assigned
2/ 4/59
5923
$15,591.68
3/10/59
6144
11,943.96
5/25/59
6642
10,623.21
7/16/59
6994
6,891.85
10/30/59
7815
8,580.63
12/ 8/59
8077
5,701.50
12/11/59
8133
9,461.36
12/30/59
8241
5,238.37
1/12/60
7,117.33
1/19/60
7,114.32
2/ 4/60
7,670.90
2/16/60
10,690.29
3/10/60
10,416.84
3/30/60
15,003.25 The documents relating to the aforesaid assignments under the dates February 4, 1959 through December 30, 1959 were executed on behalf of National Maintenance by Ben R. Stein as president. In connection with the assignments of accounts receivable, National Maintenance would periodically submit collection reports to The Cosmopolitan *154 National Bank. Ben Stein on behalfof National Maintenance Corp. executed the following reports: Schedule
Invoice
Amount
Number
Date
Debtor
Assigned
2/28/59
Shea-Matson
$2,437.57
J & J Exhibitors
6,353.64
2
1/19/59
Chrysler Corp.
1,302.64
1
1/19/59
Chrysler Div.
2,800.00
2
Chrysler Corp.
926.77
2
1/19/59
Geo. P. Johnson and American Mtr.
2,045.51
2
1/19/59
Gardner Display
3,086.00
2
1/ 7/59
Hartwig
800.00
8
11/30/59
Union Liquor Co.
303.94
12/ 4/59
Union Liquor Co.
1,472.44
4
5/ 8/59
Shea-Matson
3,410.93
9/30/59
J & J Exhibitors
6,500.00
The net proceeds from the following loans made by the Cosmopolitan National Bank of Chicago to National Maintenance Corp. were deposited in the unrecorded Cosmopolitan Bank account of National Maintenance. Loan
Amount
Service
Net
Date
Number
of Loan
Charge
Deposit
1/26/59
5838
$10,000.00
$42.87
$9,957.13
2/ 5/59
5923
10,000.00
58.47
9,941.51
3/10/59
6144
8,000.00
59.72
7,940.28
5/25/59
6642
8,500.00
53.12
8,446.88
7/16/59
6994
5,000.00
34.46
4,965.54
10/30/59
7815
6,500.00
32.18
6,467.82
12/ 8/59
8077
4,500.00
21.38
4,478.62
12/11/59
8113
7,500.00
23.65
7,476.35
12/30/59
8241
4,000.00
26.19
3,973.81 A checking account with the Cosmopolitan National Bank of Chicago was initially opened in the name of All-Work Co., a corporation wholly owned by Ben Stein *155 on September 3, 1955. All-Work Co. went out of business in 1955 or 1956 and remained a shell at all times thereafter. After All-Work Co. went out of business, Ben Stein continued to maintain its bank account over which he exercised exclusive control until it was closed on June 9, 1960. This account was carried under the office address and telephone number of Hibbard Dowel Co. and Ben Stein was at all times authorized to withdraw funds from this account. Harold Hibbard was never authorized to draw checks on this account, nor did he have any interest in this account. The balance in the All-Work Co. bank account on December 27, 1956 was $2.43. Deposits totaling $106,416.14 were made to the All-Work Co. bank account during the period beginning January 21, 1957 and ending June 3, 1959. Ben Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks drawn by National Maintenance on its unrecorded Cosmopolitan Bank account, which checks were depositedin the recorded bank account of National Maintenance and entered in its cash receipts journal as amounts received from Ben Stein: Date of
Amount
Date Check
Credit Entry
of Check
Deposited
4/18/59
$ 68.76
4/18/59
5/29/59
230.00
5/29/59
5/29/59
390.00
5/29/59
7/17/59
5,000.00
7/18/59
8/18/59
1,000.00
8/18/59
11/20/59
1,000.00
11/21/59
11/24/59
7.25
11/25/59
11/27/59
200.00
11/28/59
12/30/59
1,000.00
12/31/59
$8,896.01
*156 678 Ben Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks received by National Maintenance from its customers in payment of unrecorded and unreported sales of National Maintenance which checks were deposited in the recorded bank account of National Maintenance and entered in its cash receipts journal as amounts received from Ben Stein. Check
Date of
Amount of
Date of
Date Check
Customer
Number
Check
Check
Credit Entry
Deposited
J. & J. Mtr. Service
11676
3/31/59
$3,000.00
3/31/59
4/ 2/59
Joe Lowe Corp.
18692
3/31/59
1,035.80
4/ 3/59
4/ 4/59
Joe Lowe Corp.
23622
11/20/59
395.25
11/24/59
11/25/59
Joe Lowe Corp.
23584
11/19/59
397.50
11/24/59
11/25/59 Ben Stein's personal account on the books of National Maintenance was credited in the amount of $600 on December 3, 1959 with proceeds from check numbered 23769 of Hibbard Dowel Co. dated December 2, 1959 in the amount of $600, payable to National Maintenance. This check was deposited by National Maintenance in its recorded bank account on December 4, 1959 and was debited to the "Bon Soir" account on the books of Hibbard Dowel Co. Checks totaling $23,300 drawn on the All-Work Co. *157 checking account with The Cosmopolitan National Bank of Chicago were deposited in the recorded bank account of National Maintenance. The cash receipts journal of National Maintenance lists Ben Stein as the source of such funds. The following is a tabulation showing the numbers, amounts and dates of such checks, together with the dates these checks were deposited by National Maintenance, the dates they were received and the proceeds therefrom credited to Ben Stein's personal account per the cash receipts journal of National Maintenance and the dates they cleared the All-Work Co. bank account: Date Check
Date Check
Cleared
Check
Amount of
Date of
Received
Datecheck
All-Work
Number
Check
Check
CR Jr.
Deposited
Bank a/c
$ 1,000.00
1/ 8/59
1/ 8/59
1/ 9/59
3,000.00
1/10/59
1/12/59
1/13/59
1252
3,000.00
1/20/59
1/20/59
1/20/59
1/21/59
1253
5,300.00
1/22/59
1/23/59
1/23/59
1/26/59
2,500.00
3/ 3/59
3/ 3/59
3/ 4/59
1256
1,500.00
3/ 5/59
3/ 5/59
3/ 5/59
3/ 6/59
1257
3,500.00
3/ 9/59
3/ 9/59
3/ 5/59
3/10/59
1,500.00
5/26/59
5/26/59
5/27/59
1260 2,000.00 6/ 1/59
6/ 1/59
6/ 1/59
6/ 3/59 $23,300.00 Of the aforementioned checks totaling $23,300, all except the following were transfers of funds from Hibbard Dowel Co. to All-Work Co. to Ben Stein to National *158 Maintenance Corp.: Amount of
Date of
Date Check Depos-
Check
Check
ited by N.M.C.
$1,000.00
Jan. 8, 1959
3,500.00
3/9/59
3/5/59[sic]
2,000.00
6/1/59
6/1/59
Ben Stein's personal account on the books of National Maintenance Corp. was credited on the dates indicated with currency deposited by National Maintenance in its recorded bank account in the amounts and on the dates as follows: Date
Amount of
Date
Credited
Currency
Deposited
6/ 9/59
$1,000.00
6/ 9/59
8/15/59
* 500.00
8/17/59
11/ 6/59
1,000.00
11/ 6/59
11/16/59
700.00
11/16/59
12/18/59
700.00
12/18/59
12/19/59 1,000.00 12/19/59
Total $4,900.00 The cash receipts journal of National Maintenance records that the above funds were received from Ben Stein. Ben Stein's personal account on the books of National Maintenance was 679 credited on the dates and in the amounts indicated with proceeds from checks drawn by National Maintenance on its unrecorded CosmopolitanBank account, which checks were deposited in the recorded bank account of National Maintenance and entered in its cash receipts journal as amounts received from Ben Stein: Date of
Amount
Date Check
Credit Entry
of Check
Deposited
Jan. 8, 1960
$ 500.00
Jan. 8, 1960
May 20, 1960 10,000.00 May 20, 1960
$10,500.00
Ben *159 Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks received by National Maintenance from its customers in payment of unrecorded and unreported sales of National Maintenance, which checks were deposited in the recorded bank account of National Maintenance and entered in its cash receipts journal as amounts received from Ben Stein. Check
Date of
Amount
Date of
Date Check
Customer
Number
Check
of Check
Credit Entry
Deposited
Chas. Levy Circulatory Co.
750J
1/10/60
$1,563.39
1/12/60
1/12/60
Joanna Western Mills
4326
1/11/60
* 236.21
1/12/60
1/12/60
Joanna Mestern Mills
799
3/16/60
** 250.00
3/17/60
3/17/60
($1,000)
Morrison Hotel
16400
6/16/60
2,500.00
6/17/60
6/17/60
Morrison Hotel
66373
5/ 6/60 ****** 153.79
10/31/60
10/31/60
GJ-18
Morrison Hotel
16294
10/28/60
**** 221.63
10/31/60
not
deposited,
applied on
NMC bank
loan
Total
$4,925.02
Ben Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks and currency deposited by National *160 Maintenance in its recorded bank account and entered in its cash receipts journal as funds received from Ben Stein as follows: Check
Date of
Amount
Date of
Date Check
Number
Check
of Check
Credit Entry
Deposited
24028
2/ 1/60
* $ 700.00
2/ 2/60
2/ 3/60
24150
3/ 1/60
** 700.00
3/ 1/60
3/ 1/60
24158
3/ 2/60
** 1,500.00
3/ 3/60
3/ 3/60
24250
3/31/60
** 700.00
3/31/60
3/31/60
24554
6/23/60
** 400.00
6/23/60
6/23/60
Total
$4,000.00
Ben Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks received from Hibbard DowelCo. and deposited by National Maintenance in its recorded bank account: Date of
Credit
Nature of Item
Amount
Date of
Entry
Deposited
Credited
Deposit
1/ 7/60
Currency
$ 500.00
1/ 7/60
1/12/60
Coin
.40
1/12/60
3/ 2/60
Not Identified
2,000.00
3/ 2/60
5/10/60
NMC Check
1,000.00
5/11/60
7/ 5/60
Not Identified
150.00
7/ 5/60 680 Date of
Credit
Nature of Item
Amount
Date of
Entry
Deposited
Credited
Deposit
Currency
$ 100.00
7/ 5/60
8/15/60
Not Identified
250.00
7/ 5/60
8/15/60
250.00
8/15/60
10/24/60
Currency
1,000.00
10/24/60
12/20/60
Currency
1,000.00
12/20/60
Total
$6,250.40
Ben *161 Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated with proceeds from checks drawn by National Maintenance on its unrecorded Cosmopolitan Bank account, which checks were deposited in the recorded bank account of National Maintenance and entered in its cash receipts journal as amounts received from Ben Stein: Date of
Amount of
Date Check
Credit Entry
Check
Deposited
9/26/61
$ 100.00
9/26/61
10/ 2/61
2,700.00
10/ 2/61
$2,800.00 Ben Stein's personal account on the books of National Maintenance was credited on the dates and in the amounts indicated for funds entered in the cash receipts journal of National Maintenance as received from Ben Stein: Date of
Nature of
Credit
Item
Amount
Date of
Entry
Deposited
Credited
Deposit
3/23/61
Currency
$ 600.00
3/23/61
9/19/61
Not Identified
3,100.00
9/19/61
9/22/61
Not Identified
2,600.00
9/22/61
9/29/61
Currency
525.00
9/29/61
10/10/61
Not Identified
743.36
10/10/61
Total
$7,568.36
Ben Stein's personal account on the books of National Maintenance had the following balances at the dates indicated: Balance
Date
Debit
Credit
1/ 1/57
$ 19,500.00
12/31/57
24,357.51
12/31/58
26,314.91
12/31/59
16,312.00
12/31/60
14,322.54
11/ 2/61
3,099.75
On their *162 joint Federal income tax return filed for the taxable year 1961, petitioners Ben and Sylvia Stein reported the amount of $5,557.42 as wages received from Metropolitan Fair and Exposition Authority. No Federal income tax was reported or claimed on their return as being withheld therefrom. On their joint Federal income taxreturn filed for the taxable year 1962, Ben and Sylvia Stein reported as income from other sources the amount of $5,118.43 as received from "Metropolitan Fair and Exposition Authority - Chicago - Management Fee." Metropolitan Fair and Exposition Authority, McCormick Place, Chicago, Illinois, a municipal corporation, is political subdivision of the State of Illinois engaged in the activity of promoting fairs and expositions in Cook County, Illinois. During the calendar year 1961, Metropolitan Fair and Exposition Authority drew checks in payment of management fees to National Maintenance and Ben Stein as follows: Date of
Check
Amount of
Period
Check
Number
Check
Payee
Covered
5/31/61
6948
$2,500.00
National Maintenance Corp.
4/14/61-5/14/61
8/ 3/61
8846
5,688.95
National Maintenance Corp.
2/22/61-6/28/61
9/ 5/61
9995
1,716.58
National Maintenance Corp.
July 1961
10/23/61
73
2,239.82
Ben Stein
August 1961
10/30/61
140
1,667.55
Ben Stein
September 1961
11/29/61
326
1,667.15
Ben Stein
October 1961
Ben *163 Stein's personal account on the books of National Maintenance Corp. was credited on the dates and in the amounts indicatedwith proceeds from checks numbered 6948, 8846 and 9995 of Metropolitan Fair and Exposition Authority deposited by National Maintenance Corp. in its recorded bank account and entered in its cash receipts journal as amounts due Ben Stein as management fees. Date of
Date
Credit
Check
Date of
Amount of
Check
Entry
Number
Check
Check
Deposited
GJ-9
6948
5/31/61
$2,500.00
6/ 1/61
8/ 7/61
8846
8/ 3/61
5,688.95
8/ 7/61
9/11/61
9995
9/ 5/61
1,716.58
9/11/61
Total
$9,905.53
Check numbered 6948 was made payable in the total amount of $12,858.21, which 681 amount included payment of management fees in the amount of $2,500 for the period April 14, 1961 to May 31, 1961. The balance of $10,358.21 was in payment of temporary labor service billed by National Maintenance to Metropolitan Fair Exposition. The check was deposited in the Cosmopolitan Bank and the bank applied $9,000 against an outstanding loan of National Maintenance and credited the remainder of $3,858.21 to the National Maintenance account. The Metropolitan Fair and Exposition Authority account on the books of National Maintenance was credited *164 with the amount of $12,874.86. Check numbered 8846 was entered in the cash receipts journal of National Maintenance on August 7, 1961 as a debit to cash and a credit to Ben Stein's personal account in the amount of $5,688.95 with an explanation "Metro Fair mgment Ben R. Stein." Check numbered 9995 was entered in the cash receipts journal of National Maintenance on September 11, 1961 as a credit to Ben Stein's personal account in the amount of $1,716.58 with the explanation "Ben R. Stein Metro Fair mgmt." During the taxable year 1962 Ben Stein received payments totaling $17,227.32 from Metropolitan Fair and Exposition Authority as management fees by checks made payable to him as follows: Check and
Date of
Voucher
Amount
Period
Check
Number
of Check
Covered
1/ 5/62
528
$2,756.03
Nov. 1961
1/30/62
727
2,362.40
Dec. 1961
3/14/62
1047
3,198.04
Feb. 1962
4/27/62
1317
5,663.90
Mar. 1962
5/22/62
1415
3,246.95
Apr. 1962
Petitioners, Ben and Sylvia Stein, reported as income the checks dated January 5, 1962 and January 30, 1962, but not the other three. The three checks which were not reported were endorsed over to National Stevedoring Service, Inc. but Ben Steinwas not credited with the sum by National Stevedoring. The *165 aforesaid management fees received by Ben Stein were computed on the basis of 10 percent of the employees' payroll. National Stevedoring Service, Inc. (hereinafter referred to as National Stevedoring), an Illinois Corporation, was incorporated on January 1, 1956 with an authorized capital consisting of ten shares of common stock each with a par value of $100. The articles of incorporation name Ben Stein as one of the incorporators and original subscribers to the shares of capital stock to be issued. Samuel Wexler is named therein as the initial registered agent. On December 18, 1960, stock certificate No. 3 for ten shares of common stock of National Stevedoring was issued to Ben R. Stein. These ten shares constituted all of the outstanding capital stock of National Stevedoring at that time. Ben Stein continued to own all of the outstanding capital stock of National Stevedoring until April 15, 1963, at which time he sold his ten shares to Mike M. Kamberos. During September 1961 National Stevedoring first began business operations by continuing the business previously conducted by National Maintenance. National Maintenanceas part of its books and records maintained an account entitled *166 "Exposition Service" from September 19, 1958 through August 31, 1959. This account was maintained for the purpose of recording disbursements to and receipts from an organization headed by Jerry Jordan which provided services and furnishings in connection with automobile shows held in Chicago and other Midwest cities. The organization required large sums to purchase carpeting and both National Maintenance and Hibbard Dowel Co. assisted in financing this operation. National Maintenance issue its check No. 3853, dated January 20, 1959, in the amount of $255.65 made payable to the South East National Bank of Chicago as a payment on a loan of $8,000. This check was debited to the Exposition Service account and credited to cash. On March 19, 1959 the loans payable account was debited in the amount of $8,000 and Ben Stein's account was credited in that same amount. National Maintenance issued its check No. 4030, dated February 24, 1959, in the amount of $6,975 payable to Jerry Jordan which was debited to the "Exposition Service" account. This check bears the notation "commissions". It was endorsed by Jerry Jordan, followedby a second endorsement of Ben Stein, was deposited in the recorded *167 bank account of National Maintenance on February 26, 1959 and the proceeds were debited to cash and credited to the personal account of Ben Stein with the source designated as "Exposition" in 682 the cash receipts journal of National Maintenance. An entry dated August 31, 1959 was made on the general journal of National Maintenance debiting the "Exposition Service" account in the amount of $6,497.67 and crediting sales in the amount of $414.50 and Ben Stein's personal account in the amount of $6,083.17. The explanation for this entry was "To close a/c." National Maintenance issued its check numbered 6572, dated November 10, 1960, payable to Frank W. Pesce, in the amount of $5,000, which was debited to the miscellaneous receivables account on the books of National Maintenance. This check was endorsed by Frank W. Pesce and Best Sanitation. National Maintenance issued its check numbered 6223, dated July 21, 1960, payable to Ben Stein, in the amount of $1,000. This check was endorsed by Ben Stein and cashed on July 31, 1960. This check was debited to miscellaneous receivables account, Ben Stein "ADC" on the booksof National Maintenance. On March 2, 1961 while National Maintenance was still *168 posting items to its ledger accounts, William Gottlieb loaned Ben Stein $25,000. The check was made payable to Ben Stein, not to National Maintenance. It was endorsed by Ben Stein and further endorsed by National Maintenance. Ben Stein's account was credited with the amount of $25,000 on March 2, 1961. The ledger accounts of National Maintenance were not posted after June 30, 1961. There was a credit balance of $3,099.75 in the Ben Stein account as of September 1, 1961, after taking into consideration all journal entries but before making appropriate adjusting and closing entries. When National Maintenance ceased business in August of 1961 one of its assets were notes from the Morrison Hotel in the amount of $25,000. During 1962 Ben Stein received assets having a value of $31,995.61 from National Maintenance including the Morrison Hotel notes plus various trade receivables having a value of $6,995.61. Ben Stein transferred the Morrison Hotel notes to William Gottlieb in settlement of his personal debt. The notes were paid in full by Morrison Hotel during 1962. The trade receivables in the amountof $6,995.61 were transferred by Ben Stein to National Stevedoring. National Stevedoring *169 for its fiscal years 1962 and 1963 charged on its books total expenditures in the amounts and for the items indicated in the following schedule: 1962
1963
Travel
$1,491.87
Entertainment
2,420.80
$ 441.21
Sales Promotion
5,098.54
3,535.98
Hospitalization Insurance
209.42
195.04
Salary - Sam Stein
1,850.00
$9,220.63
$6,022.23
The expenditures included in these charges were made in the calendar years 1961, 1962 and 1963 in the amounts as follows: Calendar Year
1961
1962
1963
Travel
$ 20.00
[2,880.85)
$0
Entertainment
1,453.03
( )
Sales Promotion
1,241.73
5,991.86
1,400.93
Hospitalization Insurance
63.14
243.80
97.52
Salary - Sam Stein
1,100.00
750.00
$2,770.90
$10,216.51
$2,248.45
Following Sam Stein's illness in 1960 or 1961, he was unable to work. His illness lasted 8 years until he died in 1969 at the age of 83. During 1962 and 1963 Ben Stein supported his mother and father, Sam and Reba Stein. During the calendar years 1961, 1962 and 1963 the following amounts were deposited in the bank accountof National Stevedoring and credited to Ben Stein's account on the books of that corporation: Year
Amount
1961
$40,287.11
1962
16,470.77
1963
3,150.00
The total of such credits for the fiscal years 1962 and 1963 of National Stevedoring were *170 $68,098.57 and $12,509.31, respectively. Included in the $40,287.11 credited to Ben Stein's personal account with National Stevedoring during the calendar year 1961 were the following items: 683 Date
Item
(1) Sept. 14, 1961
A transfer of $1,500 from National Maintenance to
National Stevedoring by check #7678. This check was endorsed by National Stevedoring. Ben Stein's account with National Maintenance was debited $1,500 and his ac- count with National Stevedoring was credited $1,500.
(2) Sept. 19, 1961
William Gottlieb gave Ben Stein two cashier's checks totaling $9,000. A deposit in that same amount was made on the same day by National Stevedoring. Ben Stein's account with National Stevedoring was credited in the same amount.
(3) Oct. 17, 1961
William Gottlieb gave Ben Stein a check for $7,000 payable to Stein. This check was endorsed by Stein and National Stevedoring. Ben Stein's account with
National Stevedoring was credited in the same amount.
(4) Oct. 30, 1961
A transfer of $500 from Midwest Maintenance Service, Inc. to National Steve- doring by check No. 130 payable to National Stevedoring. Ben Stein's account with Midwest Maintenance was debited $500 and his account with National Stevedoring was credited $500.
*171 During the calendar year 1962 the following item credited to Ben Stein's personal account with National Stevedoring was included in the total credits of $16,470.77: Date
Item
Aug. 14, 1962
A transfer of $2,000 from Hibbard Dowel Co. to National Stevedoring by check No. 26522. This check was endorsed by National Stevedoring. Ben Stein's account with Hibbard Dowel Co. was debited $2,000 and his account with National Maintenance
was credited $2,000.
Ben Stein sold his ten shares of stock in National Stevedoring on April 15, 1963 to Mike M. Kamberos. Kamberos and Stein agreed that Stein would transfer his ten shares and that Stein would personally assume and pay off any corporate liabilities with the exception of accrued taxes payable. Stein would receive $25,000 plus the value of the accounts receivable less the accrued taxes payable. Because the accrued taxes payable exceeded the value of the accounts receivable, Stein received $19,960.72. After he purchased the stock, Kamberos opened a new bank account in the corporate name. Ben Stein was not authorized to withdraw funds from this account. The checks Ben Stein received from Kamberos were depositedin National Stevedoring's old bank account *172 from which Ben Stein and not Mike Kamberos could withdraw funds. Ben and Sylvia Stein reported a long-term capital gain on their joint Federal income tax return for 1963 in the amount of $1,631.22 from the sale of the stock of National Stevedoring. In connection therewith petitioners reported that the stock was acquired during September 1961 and had a cost or other basis of $1,000 and was sold during April 1963 at a gross sales price of $2,631.22. Midwest Maintenance Service, Inc., a corporation, (hereinafter referred to as Midwest Maintenance) was formed in 1961 and took over some of the business previously conducted by Ben Stein through National Stevedoring. Ben Stein owned all of the outstanding capital stock of Midwest Maintenance. Petitioners Ben and Sylvia Stein reported on their joint Federal income tax returns for 1962 and 1963 income from Midwest Maintenance in the amounts of $13,000 and $34,500, respectively. [2] *173 During the fiscal years 1962 and 1963 money aggregating $28,833.52 and $48,318.81, respectively, was deposited in the bank account of Midwest Maintenance and credited to Ben Stein's account on the books of that corporation. These deposits and corresponding credits were made and entered in the calendar years 1961, 1962 and 1963. The following schedule shows the amounts credited to Ben Stein's account during each of these calendar years: Year
Amount
1961
$20,550.00
1962
51,480.10
1963
5,172.23 684 Included in the credits of $51,480.10 to Ben Stein's account in 1962 is a transfer of funds on September 30, 1962 from William Gottlieb to Ben Stein in the amount of $25,000. Gottlieb is an officer of Midwest Maintenance as well as being an investor in real estate. There is no written evidence of a loan made in 1962 by Gottlieb to Stein or Midwest Maintenance nor security for any such loan. There had been no payment of interest or principal on any loan of $25,000 made by Gottlieb to Stein or Midwest Maintenance in 1962 as of the date of the trial of this case. On November 22, 1963, a fire destroyed the entire contents of Ben and Sylvia Stein's apartment inChicago. At the time of the *174 fire, Ben Stein carried insurance covering loss and damage by fire of $21,900 on unscheduled personal property and $19,225 on scheduled property. During the week after the fire occurred, the insurance adjustors took pictures and worked in the apartment listing the losses. Everything was cleaned out of the apartment within a week or 10 days after the fire occurred by scavengers hired by the insurance company. With respect to unscheduled personal property, Ben Stein's claim of $21,900 the full amount of coverage, was allowed by the insurance company, as was his claim of $1,747.20 with respect to scheduled personal property. The total of such said claims of $23,647.20 was subject to a $100 deductible provision. The net amount of the claim allowed by the insurance company amounted to $23,547.20. Attached to Ben and Sylvia Stein's joint Federal income tax return for 1963 was a statement from Toplis and Harding, Inc., adjusters and surveyors, which set out the following details: Unscheduled Personal Property:
Sound Value, as agreed
$68,052.00
Loss and Damage as claimed
85,907.70
Less: Overestimates and depreciation as agreed 20,756.70
Loss
$65,151.00
Policy Limit 21,900.00
Scheduled Personal Property:
Mink coat
Sound value, as agreed
$ 1,747.20
Loss, as claimed
3,500.00
Depreciation, as agreed 1,752.80
Loss
$ 1,747.20
Totals:
Value
Loss
Claim
$69,799.20
$66,898.20
$23,647.20
Less deductible 100.00
$23,547.20
Less paid to adjuster 2,354.72
Net proceeds
$21,192.48
The *175 Steins claimed on their 1963 return a casualty loss of $45,705.72. The Steins paid their interior decorator $31,278.38 between 1961 and the date of the fire for having their apartment redecorated and for some additional furnishings for the apartment. Included in the items the Steins obtained from the decorator were curtains and draperies, figurines and decorative crystal, wall paper and some furniture. When the interior decorator was working in the apartment there were items there obtained by the Steins from other sources. Some of these items were the following with the estimated replacement value indicated: Estimated replace-
Item
ment value
Painting and wall papering
$5,000
Oriental rugs
3,500
Flooring
4,000
Paintings
6,000
Cabinet work
4,500
Bronze gate
1,500
Linens
5,000
Silverware
4,000
China
1,000
Crystal
700
Clothing
3,000 Petitioners Ben and Sylvia Stein claimed deductions on their Federal income tax returns for the years 1958, 1961 and 1963 for charitable contributions in the amounts of $1,325.50, $600, and $840, respectively. The contributions of $1,325.50 in 1958 were stated to consist of one-half of the contributions of the Hibbard Dowel Co. partnership or $586.50, a contribution of $639 to the *176 Anshe Mizrach Congregation and $100 miscellaneous contributions. The ledger of Hibbard Dowel Co. shows only two contributions during 1958, one to the Hadassah for $10 and one to the Chicago Policemen's Benevolent Association for $5. This latter contribution was debited to the miscellaneous expenses account on the partnership books. Petitioner Ben Stein had over a period of years contributed to the Anshe Mizrach Congregation. In 1963 he contributed $645 to that synagogue. 685 The contributions of $600 in 1960 were stated to consist of a $500 contribution to the Anshe Mizrach Congregation and $100 in miscellaneous contributions. The contributions in 1963 were stated to consist of $650 donated to Anshe Mizrach Congregation and $190 to various other charities. On their joint Federal income taxreturns filed for the taxable years 1958, 1959 and 1960, petitioners Ben and Sylvia Stein claimed dependency exemptions for Ben's parents, Reba and Sam Stein. Sam Stein received the following amounts of money from National Maintenance during the years 1958, 1959 and 1960: Year
Amount
1958
$1,100
1959
1,285
1960
1,500 These amounts were charged to the transportation expense account of National Maintenance. *177 On their joint Federal income tax returns for the taxable years 1958, 1961 and 1963, petitioners Ben annd Sylvia Stein claimed deductions for State sales taxes in the amounts of $250, $400, and $400, respectively. The sales tax rate in Illinois during these years was 2 and one-half percent. On their joint Federal income tax returns for the taxable years 1958 and 1961, petitioners Ben and Sylvia Stein listed their medical expenses as $1,402 and $1,984, respectively. They claimed as itemized deductions the excess of these amounts over 3 percent of their adjusted gross income as reported for each year. Facts Applicable Only to the Hibbards When the Hibbard Dowel Co. partnership was formed in 1949, Ben Stein was obliged to pay Harold Hibbard $36,000 fora one-half interest. Stein gave Hibbard a note for that amount but never paid any amounts to discharge the debt even though Hibbard would occasionally request payment. On November 8, 1956, Ben Stein purchased the beneficial interest in a building located at 116 E. Oak Street, Chicago from Ralph J. Van Dyke. Although Stein purchased the property with his own funds, Harold Hibbard's name appears as the beneficial owner. Shortly after the *178 purchase of the building by Stein, Hibbard agreed to return the note to Stein in exchange for a one-half beneficial interest in the building. No written assignment was required because Hibbard was already the owner of the whole beneficial interest according to the records on file with the Chicago Title and Trust Co., the owner of the legal title. On August 21, 1959, Harold Hibbard signed a document assigning one-half of his beneficial interest in the Oak Street property over to Ben and Sylvia Stein as joint tenants. Late in 1961 Harold and Ethel Hibbard decided to move to Florida, primarily because of Harold's failing health. Because of leaving the Chicago area, Harold Hibbard arranged to sell his interest in the Oak Street property to Ben andSylvia Stein. The assignment of the interest was dated December 30, 1961. Stein agreed to pay Hibbard $5,000 in cash and gave Hibbard a note for $31,000. This note is as follows: $31,000 December 29, 1961 Ten years after date, for value received, the undersigned promises to Pay to the order of Harold Hibbard at Chicago, Illinois, the sum of Thirty One Thousand and no/100 Dollars with interest at the rate of no percent per annum after until paid. *179 * * * /s/ Ben R. Stein /s/ Sylvia Stein
As of the date of the trial, February 1971, there was a balance due on the note of $20,816.34. On their joint Federal income tax return for 1961, Harold and Ethel Hibbard reported a loss of $9,924 on the sale of the Oak Street property. This amount was computed as follows: Cost plus improvements
$42,227.53
Gross sales price
$27,500.00
Depreciation allowed
4,802.67 32,302.67
$ 9,924.86
On their joint Federal income tax return for 1958, petitioners Harold and Ethel Hibbard claimed a deduction in the amount of $1,140.55 as a partnership ordinary loss from G.C.T. Distributors, Hammond, Indiana, and a deductible rental loss of $134.73 in connection with aframe building located at Gary, Indiana. Both of these losses were claimed in connection with property which had been owned by Ethel Hibbard's first husband, who died prior to 1958. 686 Harold Hibbard obtained these figures from a certified public accountant who prepared the partnership return of G.C.T. Distributors. Hibbard had destroyed any records he had pertaining to that return prior to the trial of this case. The records showing the expenses incurred relative to the Gary, Indiana property were lost *180 by Hibbard when he moved. In his statutory notice, respondent determined that the ordinary taxable income of Hibbard-Stein Enterprises for its taxable years ending January 31, 1958 and January 31, 1959 and for its taxable period ending February 28, 1959 was in the amounts of $90,594.05, $92,040.40 and $6,955.67, respectively, and that one-half of each of these amounts was distributable to Harold Hibbard and one-half to Ben Stein. At the trial and on brief respondent made certain concessions with respect to his determinations of income of the Hibbard Dowel Co. partnership for these years and this period. The following schedules show the details of respondent's determinationas set forth in the statutory notice and the concessions he has made: Fiscal Year Ended January 31, 1958
Statutory
Respondent's determination
Notice
reflecting concessions
Understatement of Revenue
Unreported sales
$35,800.68
$35,800.68
Overstatement of Expenses
Interest
1,007.30
1,007.30
Bad debts
2,357.90
2,357.90
Boat and Auto Depreciation
8,139.91
8,139.91
Audit and Legal Fees
1,076.00
Auto Expense
2,032.65
2,032.65
Boat Expense
2,696.98
2,696.98
Entertainments Prom.
6,339.85
6,339.85
Misc. Expenses
519.57
Office Supplies
744.84
TravelExp. 4,711.64
Understatement of Income
65,427.32
58,375.27
Reported per return 25,166.73
25,166.73
Corrected Partnership Income
$90,594.05
$83,542.00
Distributive Share:
Taxable Year
Ben Stein
Harold Hibbard
Total
1958
$41,771.00
$41,771.00
$83,542.00
*181 687 Partnership Taxable Year Ending January 31, 1959
Statutory
Respondent's determination
Notice
reflecting concessions
Understatement of Revenue
Unreported Sales
$36,037.05
$36,037.05
Overstatement of Expenses
Interest
1,331.25
1,331.25
Bad Debt
4,693.00
4,693.00
Boats and Auto Depreciation
6,020.59
6,020.59
Auto Expense
1,696.17
1,696.17
Boat Expense
2,320.18
2,320.18
Entertainment and Promotion
5,039.61
5,039.61
Loss on Contract
5,000.00
5,000.00
Misc. Exp.
488.97
Office Supplies
560.50
Travel Expenses
3,211.33
Insurance 3,463.58
1,847.68
Understatement of Income
$69,862.23
$63,985.53
Reported per return
22,178.17
22,178.17
Corrected Partnership Income
$92,040.40
$86,163.70
Distributive Share:
Taxable Year
Ben Stein
Arold Hibbard
Total
1959
$43,081.85
$43,081.85
$86,163.70 Partnership Taxable Period February 1, 1959 to February 28, 1959: Statutory
Respondent's determination
Notice
reflecting concessions
Understatement of Revenue
Unreported sales
$4,157.25
$4,157.25
Overstatement of Deductions
Interest
91.67
91.67
Boat and auto depreciation
326.67
326.67
Auto Expense
335.24
335.24
Boat Expense
67.60
67.60
Entertainment and Promotion
339.92
339.92
Misc. Expenses
14.40
Office supplies
15.70
Travel Expense
162.14
Insurance 309.87
149.87
Understatement of Income
$5,820.46
$5,468.22
Reported per return 1,135.21
1,135.21
Corrected Partnership Income
$6,955.67
$6,603.43
Distribution:
Tax Period
Ben Stein
Harold Hibbard
total
February 1959
$3,301.72
$3,301.71
$6,603.43
*182 688 Respondent in his notice of deficiency determined that the correct taxable income of Hibbard Dowel Co. amounted to $102,351.15 and $63,264.79, respectively, for its taxable years ending February 29, 1960 and February 28, 1961. At trial and in brief he made certain concessions as to some adjustments. The following schedule shows the determination made in the statutory notice and respondent'sconcessions: Taxable Year Ending February 29, 1960
Statutory
Respondent's determination
Notice
reflecting concessions
Understatement of Revenue
Unreported Sales
$51,080.59
$51,080.59
Overstatement of deductions
Bad debts
1,299.12
1,299.12
Interest
1,294.58
1,294.58
Boat and auto depreciation
4,304.70
4,304.70
Auto expense
2,450.26
2,450.26
Boat expense
2,673.58
2,673.58
Promotion Expense
4,965.31
4,965.31
Insurance Expense
3,850.23
3,850.23
Travel Expense 3,295.91
0
Understatement of Income
$75,214.28
$71,918.37
Reported per return 27,136.87
27,136.87
Corrected income
$102,351.15
$99,055.24
Taxable Year Ending February
28, 1961
Statutory
Respondent's determination
Notice
reflecting concessions
Understatement of Revenue
Unreported Sales
$ 16,545.00
$16,545.00
Overstatement of deductions
Bad debts
1,334.92
1,334.92
Interest
1,062.22
1,062.22
Boat and auto depreciation
2,300.02
2,300.02
Auto expense
1,595.95
1,595.95
Boat expense
462.66
462.66
Promotion expense
2,248.47
2,248.47
Insurance
4,385.38
1,936.52
Travel
3,524.24
Misc. Expenses
391.26
Office Expenses 412.92
Understatement of Income
$34,263.04
$27,485.76
Reported per return 31,001.75
31,001.75
Corrected Income
$65,264.79
$58,487.51
*183 689 Respondent likewise concedes that adjustments reflecting these concessions should be made in the dividends and undistributed taxable income he determined was received by the Hibbards and Steins as a result of his adjustments to the income of Hibbard Dowel Co. for its fiscal years 1960 and 1961. In addition to increasing the income of the Steins from Hibbard Dowel Co. in the years 1959 through 1961, respondent made the following determinations increasing the income of the Steins as reported in his notice of deficiencies to the Steins which are still in issue: Nature of Item
1958
1959
1960
1961
1962
1963
Income from National
$42,524.56
$25,675.42
$10,368.36
Maintenance or
13,313.82
5,000.00
various accounts
1,000.00
carried on that
corporation's books
(separate accounts shown separately)
Withdrawals from
National Maintenance
$31,995.61
Transactions with
9,220.63
$6,022.23
National Stevedoring
47,398.57
12,509.31
Management fees from
Metropolitan Fair
9,922.63
12,108.89
Income from
28,833.52
48,318.81
Midwest Maintenance
10,376.16
13,964.57
Understatement of
18,960.72
capital gain on
sale of National
Stevedoring stock
Disallowance of
deductions for
Casualty loss
45,702.72
Contributions
$1,325.50
600.00
840.00
Sales tax
250.00
400.00
400.00
Medical expenses
1,052.25
945.00
Dependency exemptions
1,200.00
1,200.00
1,200.00
*184 Respondent determined that part of the underpayment in tax by the Steins for each of the years here in issue was due to fraud. On brief respondent concedes that no part of this underpayment for the year 1963 was due to fraud. In addition to his determination that the Hibbards failed to report all of their distributive share of income in 1958 and 1961 and dividends in 1961 of Hibbard Dowel Co., respondent made the following determinations in his notice of deficiency to the Hibbards adjusting their income as reported for the calendar years 1958 and 1961 which are still in issue. 1958
1961
Disallowance of deduction for:
Ordinary partnership loss of G.C.T. Distributors
$1,140.55
Loss on rental of building in Gary, Indiana
134.73
Loss on sale of Oak Street property
$9,924.86
Respondent also determined that part of the underpayment in tax by the Hibbards for each of the years 1958 and 1961 was due to fraud. On brief petitioner concedes the fraud issue. Ultimate Facts 1. Hibbard-Stein Enterprises understated its ordinary income for its fiscal year ending January 31, 1958 by the amount of $52,066.68. 690 Understated sales income
$35,800.68
Overstated deductions boat and auto deprecia-tion
$6,507.46
auto expense
1,355.10
boat expense
2,696.98
business promotion
5,705.86 16,265.40
Understatement of ordinary income
$52,066.08
*185 2. Hibbard-Stein Enterprises understated its ordinary income for its fiscal year ending January 31, 1959 by the amount of $60,246.99. Understated sales income
$36,037.05
Overstated deductions bad debt
$4,552.00
boat and auto depreciation
4,957.91
auto expense
1,130.78
boat expense
2,320.18
business promotion
4,535.65
loss on contract
5,000.00
insurance cost of sales
1,713.42 24,209.94
Understatement of ordinary income
$60,246.99
3. Hibbard-Stein Enterprises understated its ordinary income for its taxable period February 1, through February 28, 1959 by the amount of $5,189.72: Understatement of sales income
$4,157.25
Overstatement of deductions
boat and auto depreciation
$296.47
auto expense
223.49
boat expense
67.60
business promotion
305.93
insurance - cost of sales
138.98 1,032.47
Understatement of ordinary income
$5,189.72
4. Hibbard Dowel Co., Inc., understated its taxable income for its fiscal year ending February 29, 1960 by the amount of $64,837.78: Understatement of sales income
$51,080.59
Overstatement of deductions boat and auto depreciation
$3,622.19
auto expense
1,633.51
boat expense
2,673.58
sales promotion
4,468.78
insurance - cost of sales
1,359.13 13,757.19
Understatement of ordinary income
$64,837.78 5. Hibbard *186 Dowel Co., Inc. understated its taxable income for its fiscal year ending February 28, 1961 by the amount of $25,003.12. Understatement of sales income
$16,545.00
Overstatement of deductions bad debts
$1,334.92
boat and auto depreciation
1,737.12
auto expenses
1,063.97
boat expenses
462.66
business promotion
2,023.62
insurance - cost of sales
1,835.83 8,458.12
Understatement of ordinary income
$25,003.12
6. The taxable distributive share of partnership income from Hibbard-Stein Enterprises as reported by petitioners Ben and Sylvia Stein was understated by the amounts of $26,033.04 and $32,718.36 for their taxable years 1958 and 1959, respectively. 7. Petitioners Ben and Sylvia Stein failed to report taxable income from Hibbard Dowel Co. Inc. in the amounts of $18,535.63, $28,016.02, and $1,250.71 for their taxable years 1959, 1960, and 1961, respectively. 8. Petitioners Ben and Sylvia Stein failed to report taxable income as management fees received from Metropolitan Fair and Exposition Authority in the amounts of $7,422.63 and $12,108.89 for the taxable years 1961 and 1962, respectively. 9. Petitioners Ben and Sylvia Steinfailed to report taxable income in the amounts of $24,724.56, $23,925.42, *187 and $9,843.36 for the taxable years 1959, 1960, and 1961, respectively, resulting from certain transactions recorded in Ben Stein's personal account on the books of National Maintenance Corp. 10. Petitioners Ben and Sylvia Stein failed to report taxable income for their taxable year 1959 in the amount of $13,058.17 from National Maintenance Corp. in connection with an organization designated "Exposition Service." 11. Petitioners Ben and Sylvia Stein failed to report taxable income in their taxable year 1960 in the amount of $5,000 from National Maintenance Corp. in connection with a transaction involving "Best Sanitation." 12. Petitioners Ben and Sylvia Stein failed to report taxable income in their taxable year 1962 in the amount of $30,547.19 resulting from the acquisition and withdrawal by Ben Stein of certain notes and accounts receivable from National Maintenance Corp. 13. Petitioners Ben and Sylvia Stein failed to report taxable income in the amounts of $10,185.31 and $1,908.81 for the taxable years 1962 and 1963, respectively, resulting from payments made to and for the benefit of Ben Stein byNational Stevedoring. 14. Petitioners Ben and Sylvia Stein failed to report taxable *188 income in the amounts of $14,470.77 and $3,150 for their taxable years 1962 and 1963, respectively, resulting from certain transactions recorded in Ben Stein's personal account on the books of National Stevedoring. 15. Petitioners Ben and Sylvia Stein understated the capital gain reported in the taxable year 1963 by the amount of 691 $17,329.50 resulting from the sale of capital stock of National Stevedoring. 16. Petitioners Ben and Sylvia Stein failed to report taxable income in the amounts of $10,376.16 and $13,964.57 for the taxable years 1962 and 1963, respectively, as a result of expenditures made to and for the benefit of Ben Stein by Midwest Maintenance. 17. Petitioners Ben and Sylvia Stein failed to report taxable income in the amounts of $26,480.10 and $5,172.23 in their taxable years 1962 and 1963, respectively, resulting from certain transactions recorded in Ben Stein's personal account on the books of Midwest Maintenance. 18. Petitioners Ben and Sylvia Stein were entitled to a casualty loss deduction for the taxable year 1963 in the amount of $45,705.72 as a result of firedamage. 19. Petitioners Ben and Sylvia Stein are entitled to deductions as contributions in the amounts *189 of $644, $500, and $650 for the taxable years 1958, 1961, and 1963, respectively. 20. Petitioners Ben and Sylvia Stein are not entitled to deductions as dependency exemptions for either Sam or Reba Stein for each of the taxable years 1958, 1959, and 1960. 21. All or part of the underpayment of tax by petitioners Ben and Sylvia Stein for each of the taxable years 1958 to 1962, inclusive, is due to fraud with intent to evade tax. 22. The taxable distributive share of partnership income from Hibbard-Stein Enterprises as reported by petitioners Harold and Ethel Hibbard was understated by the amount of $26,033.04 for their taxable year 1958. 23. Petitioners Harold and Ethel Hibbard failed to report taxable income from Hibbard Dowel Co. in the amount of $14,674.43 for their taxable year 1961. 24. Petitioners Harold and Ethel Hibbard are not entitled to a deduction of $1,140.55 for the taxable year 1958 as a partnership ordinary loss from G.C.T. Distributors, Hammond, Indiana. 25. Petitioners Harold and Ethel Hibbard are not entitled to a deductible rental loss in the amountof $134.73 for the taxable year 1958 in connection with a frame building located at Gary, Indiana. 26. Petitioners Harold *190 and Ethel Hibbard incurred a deductible loss in the amount of $4,197.33 for the taxable year 1961 relating to real property located at 116 East Oak Street, Chicago, Illinois. 27. Part of the underpayment in tax of Harold and Ethel Hibbard for each of the years 1958 and 1961 is due to fraud with intent to evade tax. Opinion Since the assessment of any tax against the Steins for the years 1959 and 1960 is barred by the statute of limitations unless the returns filed by them for those years were fraudulent with intent to evade tax, we will first consider the fraud issue. Respondent, of course, must prove fraud by clear and convincing evidence. In this case, the Hibbards have conceded that Harold Hibbard during the years 1958, 1959, and 1960 was a party to not recording receipts from sales from customers of Hibbard Dowel Co. on the books of the partnership and corporation in order to evade tax on those receipts. Respondent has conceded that no part of the underpayment in tax of the Steins for the year 1963 was due to fraud. Therefore, the issue as to fraud islimited to the years 1958 through 1962 and to the petitioners Ben and Sylvia Stein. Harold Hibbard testified to the scheme which *191 he and Ben Stein had worked out and in which they both participated to understate the sales of the Hibbard Dowel Co. partnership or small business corporation for the years 1958, 1959 and 1960 in order to evade tax on this income. Hibbard's testimony was in most respects forthright and convincing. The Court observed Hibbard as he testified and evaluated his testimony on the basis of this observation as well as on the basis of the other evidence which supported much of this testimony. Considering the record as a whole, we are convinced by Hibbard's testimony that he and Stein were both involved in understating the sales of Hibbard Dowel Co. for the years 1958, 1959 and 1960 in order to evade Federal income tax on these receipts. We are also convinced that Stein was the instigator of the scheme and directed its operation. We have set forth facts with respect to the manner in which the books of Hibbard Dowel Co. were handled in order to conceal the understatement of sales of the business and the understatement of the distributable income to Hibbard and Steinfrom these transactions. We consider these findings to be clear and convincing that a part of the underpayment of tax by the Steins *192 692 for the years 1958, 1959 and 1960 was due to fraud. However, there is other evidence in the record which is clear and convincing that a part of Stein's underpayment of tax in these years was due to fraud. Some of these are (1) the use of a bank account for National Maintenance which was not recorded on the books of that company and into which funds from unreported sales of Hibbard Dowel Co. were deposited; (2) the unexplained transfers of funds from the bank account of one entity to that of another with the final credit in many instances being to the personal account of Ben Stein on the books of one of the companies; and (3) the fact that sales invoices on the series which were not to be recorded were issued and checks in payment of such invoices not recorded on the company records when Hibbard was away from the office for extended periods and the office was being run by Stein. Stein claims that Harold Hibbard was cheating him by suppressing sales and that he did not discover this cheating until 1960 and at that time required an accountingfrom Hibbard. We do not believe that Stein was unaware of the scheme to underreport sales until 1960. We believe Stein was a part of the scheme *193 and profiting from it from its beginning in 1957 [3] It may be that Hibbard was taking, as Stein thought he was, more of the unreported income than the two of them had agreed should go to Hibbard. This, however, does not lessen Stein's fraudulent acts. Stein's story, which we do not accept, that he had absolutely no knowledge of sales being suppressed, that Hibbard and Novinson had schemed to defraud him as well as theGovernment, still does not explain the failure of Hibbard Dowel Co. to report all its receipts from sales in its fiscal year 1961. Stein was a knowledgeable *194 businessman and would know upon learning that Hibbard had failed to record certain sales on the appropriate ledger account, that he should take steps to insure that the correct amount of sales were reported for that year. Not only did Stein do nothing to assure that the correct amount of sales were reported, he even refused to allow his auditor to examine the company books and records. Stein's failure to take steps to determine and correctly report the gross income of Hibbard Dowel Co. evidences a fraudulent purpose. M. Rea Gano, 19 B.T.A. 518 (1930). Respondent points to certain specific transactions in the years 1961 and 1962 as being clear evidence of Stein's fraudulent intent to evade tax. Respondent points to the failure of Stein to report income received from Metropolitan Fair and Exposition Authority in 1961 and 1962 and his failure to report income from National Maintenance for the year 1962. The facts are clear: Metropolitan Fair issued two checks to National Maintenance in payment for services rendered. Stein's account with National Maintenance was credited with a portion of the funds received and Stein failed to include the amounts so credited to his account in his reported *195 gross income. Stein contends that Louis Novinson caused the sums to be credited to his account to make up defalcations, and that the major portion of the amount credited to his account was used to pay off bank loans of National Maintenance. However, the facts show that Stein had control over the finances of National Maintenance; that Stein was the president and treasurer of National Maintenance; and that Stein controlled the disposition of the assets of National Maintenance upon its dissolution. In our view, circumstances surrounding the creation, operation, and control of National Maintenance show that Stein's account was credited with Stein's full knowledge and full acquiescence. As we stated above, the mere fact that Stein did not immediately withdraw the funds for his personal use does not mitigate against a finding of fraud. If Stein used these funds to pay obligations of or to transfer as capital to other entities which he owned, such as National Stevedoring, he has received income which he has usedas if the funds were deposited directly in his bank account and he drew 693 a check in payment of the obligation or as a capital contribution to another entity he owned. In our view *196 the direct evidence of failure to report income considered in conjunction with the other evidence in this record is clear and convincing that part of the underpayment of tax by petitioners Ben and Sylvia Stein for the taxable year 1961 was due to fraud. [4]
In 1962 not only were checks received by Ben Stein from Metropolitan Fair not reported by him as income, but also he did not report his gain upon the dissolution of National Maintenance. Stein admits that Metropolitan Fair paid him over $17,000 in management fees during the year 1962. The Steins reported slightly over $5,000 on their return as coming from this source. Ben Stein asserts that the nonreported portion of the management fees rightfully belonged to National Stevedoring and accordingly he endorsed the checks over to that organization. Thisexplanation is not in keeping with the facts. The amounts were management fees, not the cost of labor supplied. Thus, the statement that the sums belonged to National Stevedoring is inconsistent with the *197 facts. Management fees were Stein's income not income of National Stevedoring. In our view the evidence is clear and convincing that Stein omitted this income from his 1962 return with the fraudulent intent to evade taxes. Stein knew that management fees belonged to him. In fact, several of his bills to Metropolitan Fair are headed with the caption "Ben Stein Management Fee." From these facts, together with all the other facts of record we conclude that Stein's failure to report the entire amount he received as management fees from Metropolitan Fair in 1962 was fraudulent with intent to evade the payment of taxes. Accordingly, we find that petitioners Ben and Sylvia Stein understated their taxable income during the years 1958, 1959, 1960, 1961, and 1962 and that part of the underpayments resulting from these understatements was due to fraud with intent to evade taxes. We further find that the returns filed by Ben and Sylvia Stein for the years 1959 and 1960 were false and fraudulentwith intent to evade tax and therefore respondent is not barred from assessing deficiencies against the Steins for those years. Petitioners have conceded all except the following unreported sales of Hibbard *198 Dowel Co. as determined by respondent for the years in which it was a partnership (Hibbard-Stein Enterprises): Fiscal Year
Amount in
(Period Ended)
Dispute
1/31/58
$30,768.64
1/31/59
2,639.08
2/28/59
473.84
Those amounts of unreported sales [5] which were conceded by petitioners were determined on the basis of specific items. The amounts in dispute, on the other hand, are based on unexplained bank deposits with corresponding credits to various accounts. For *199 the fiscal year ended January 31, 1958, respondent determined that of the $62,544.06 credited to the Hibbard Dowel "Exchange" account, $16,605.57 represented the proceeds of sales of merchandise. Respondent further determined that of the $16,605.57, $1,966.65 represented specifically identified sales ($1,705.18 were unrecorded sales conceded by petitioner and $261.47 were recorded sales and never in issue). Thus there remains a balance of $14,638.92 which the petitioners must show is not the proceeds of unrecorded sales. From the evidence we conclude that these credits to the Exchange account do in fact represent unrecorded sales. The evidence shows that the invoice for the particular customer would not be credited to sales or debited to accounts receivable but would be held aside by either Ben Stein or Harold Hibbard. When the customer made payment, the journal entry would be merely debit cash, credit "Exchange." 694 Petitioners have not shown what these amounts represent and the only reasonable source for the funds is unrecorded sales. We are of the opinion that the amount of such unrecorded sales is at least as great and perhaps greater than determined by respondent. A second method *200 of handling unreported sales was to transfer the checks from Hibbard Dowel Co. to National Maintenance. The checks would be deposited and National Maintenance would make the following journal entry: Dr. Cash Cr: Miscellaneous Receivables The source of each such entry would be listed as Hibbard Dowel Company. There would be, however, no journal entry on the books of Hibbard Dowel Co., either showing that a sale had been made or that funds had been advanced to National Maintenance. During the fiscal year ended January 31, 1958, there were credit entries in the Miscellaneous Receivables account of National Maintenance showing as the source Hibbard Dowel Co., where there was no corresponding entry on the books of Hibbard Dowel Co. in the amount of $17,777.05. This amount does not include the amount of $509.30 which represents identified unrecorded sales which were initially entered on the books of National Maintenance as credits to Miscellaneous Receivables. Petitioners made no showing that the $17,777.05 does not in fact represent unrecorded sales of Hibbard Dowel Co. Accordingly, we find that for the fiscal year ended January 31, 1958, Hibbard Dowel Co. understated its sales by at least *201 $35,800.68 as determined by respondent. Respondent determined that Hibbard-Stein Enterprises understated its sales by the amount of $36,037.05 for its fiscal year ended January 31, 1959. Petitioners concede unrecorded sales in the amount of $33,397.97 for this year represented by specifically identified unrecorded items. Of the amount of $102,331.54 credited to the Hibbard Dowel "Exchange" account during that fiscal year respondent determined that $20,058.67 represented the proceeds of both recorded and unrecorded sales. Respondent further determined that of the $20,058.67, the amount of $16,387.30 represented specifically identifiable sales ($16,278.44 represented unrecorded sales conceded by petitioners and $108.86 represented recorded sales never in issue). Thus, there remained $3,671.37 in unexplained credits to the Exchange account. Petitioners have the burden of showing that these amounts do not represent unrecorded sales and they have not presented any credible evidence to carry this burden. We conclude that these credits do represent unrecorded sales. During the fiscal year ended January 31, 1959, there were credits in the amount of $11,793.25to the miscellaneous receivables *202 account of National Maintenance with no corresponding entries on the books of Hibbard Dowel Co. showing a transfer of funds. The amount of $5,083.37 represents specifically identified unrecorded sales which were conceded by petitioners. Petitioners have failed to show that the remaining $6,709.88 in unexplained credits were not unrecorded sales. We find that the amount of $6,709.88 does in fact represent the proceeds of unrecorded sales. Accordingly, for the fiscal year ended January 31, 1959, we find that Hibbard-Stein Enterprises understated its sales by at least the amount determined by respondent, $36,037.05. For the month of February 1959, respondent determined that Hibbard-Stein Enterprises understated its sales by $4,157.25. Petitioners concede that sales in the amount of $3,683.41 represented by specifically identified items were not reported. Of the credits to the "Exchange" account in that month in the amount of $11,631.39, respondent determined that the amount of $1,550 represented the proceeds of recorded and unrecorded sales. Respondent further determined that of the $1,550, the amount of $1,533 represented specifically identifiablesales ($1,246.55 represented specifically *203 identified unrecorded sales conceded by petitioners and $286.45 represented reported sales never in issue). Thus there remains the amount of $17 which petitioners have failed to show does not consist of unrecorded sales. Accordingly this amount is found to also represent unrecorded sales. The evidence shows that checks totaling $1,455.99, constituting a portion of the unreported sales which petitioners conceded, were not credited to any account of Hibbard Dowel Co. but were deposited in the unrecorded National Maintenance account with the Cosmopolitan Bank. There were in addition during the month of February 695 1959 unexplained items deposited by Hibbard Dowel Co. checks in that same account totaling $1,359.07. Petitioners have the burden of showing that these deposits do not represent unrecorded sales of Hibbard Dowel Co. They have failed to carry this burden and we hold that the amount of $1,359.07 represents the proceeds of unrecorded sales of Hibbard Dowel Co. We find that for the month of February 1959 Hibbard-Stein Enterprises understated its sales by at least the amount determined by respondent, $4,157.25. For the fiscalyears ending February 29, 1960 and February 28, 1961, *204 respondent determined that Hibbard Dowel Co. (a small business corporation) failed to report sales in the amounts of $51,080.59 and $16,545, respectively. Petitioners have conceded that sales were understated by $50,005.46 and $7,996.60 for the fiscal years ended February 29, 1960 and February 28, 1961, respectively. The amounts conceded by petitioners represent specifically identified unreported sales. The excess determined by respondent represents unexplained bank deposits. During the fiscal year ended February 29, 1960, the amount of $94,238.61 was credited to the "Exchange" account of Hibbard Dowel Co. Respondent determined that this amount included credits representing the proceeds of unrecorded and recorded sales of Hibbard Dowel Co. in the amount of $32,671.40. Respondent determined that of the $32,671.40, the amount of $31,036.24 represented the proceeds of specifically identified sales, thus leaving a balance of $1,635.16 of unexplained credits. Petitioners have failed to present evidence to explain the deposits of $1,635.16 or to show that the amount does not represent the proceeds of unidentified unrecorded sales. We find that for its fiscal year ending February 29, 1960, *205 Hibbard Dowel Co. understated its sales by at least the amount determined by respondent, $51,080.59. The "Exchange" account of Hibbard Dowel Co. was credited in the amount of $51,026.42, for its fiscal year ended February 28, 1961. Respondent determined that this amount included proceeds from both recorded and unrecorded sales totaling $16,545. Of this amount respondent determined that the amount of $14,506.86 represented the proceeds of specifically identified sales, both reported and unreported. The remainder of $2,038.14 is unexplained and petitioners have failed to offer any probative evidence to show that this amount does not represent unrecorded sales. Accordingly, we find that the unexplained balance of $2,038.14 does represent the proceeds of unrecorded sales of Hibbard Dowel Co. and sustain respondent's determination that sales of that company in its fiscal year ended February 28, 1961, were understated by the amount of $16,545. Petitioners contend that respondent's determination should not be sustained since many of the deposits made in the bank account of Hibbard Dowel Co. were transferred funds from other corporations. While it is true that bank deposits which respondent *206 treats as income must first be adjusted to eliminate nontaxable items, we are satisfied that respondent did eliminate such items in making his determination. Only those entries in the various accounts which were both unexplained and similar in amount to entries shown to represent unreported sales were included by respondent in his determination. Accordingly, we reject petitioner's contention that the respondent's determinations with respect to the understated gross receipts of Hibbard-Stein Enterprises or Hibbard Dowel Co. were arbitrary or without rational foundation. To the contrary, the evidence as a whole shows that respondent made a conservative determination of the total amount of the sales of Hibbard Dowel Co. which were not recorded on its books or included in the income reported on its Federal income tax returns. The evidence clearly shows that the books and records of Hibbard Dowel Co. were so inaccurate as to in no way reflect the proper income of its business. Petitioners have admitted to understating gross sales of Hibbard Dowel Co. by an amount of approximately $100,000. The pattern used to conceal the existence ofsales which were not recorded on the books was elaborate *207 and clever. We sustain respondent's determination of the understatement of sales by Hibbard Dowel Co. for each of the fiscal years or period 1958 through 1961. Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. reported automobile expenses in the following amounts for the following fiscal years or periods. FYE 1/31/58
$2,032.65
FYE 1/31/59
1,696.17
February 1959
335.24
FYE 2/29/60
2,450.26
FYE 2/28/61
1,595.95 696 Respondent disallowed these deductions in their entirety but on brief concedes that the automobiles were used to some extent for business purposes. He contends that only a nominal amount of business use should be allowed. He contends that the business use should be determined not to exceed 10 percent. Petitioners concede that the automobiles were used for the personal use of Stein and Hibbard as well as for business and that the expenses of operating these automobiles should be allocated between business and nonbusiness use and suggest application of the rule in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Petitioners assert that a fair allocation would be 60percent for business and 40 percent for personal use. From the evidence we conclude that the company cars were used *208 for business one-thirds of the time and two-thirds for the personal purposes of Stein and Hibbard. Accordingly, we find that only one-third of the automobile expenses deducted by Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. on their tax returns are properly deductible. Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. reported deductions for $2,696.98, $2,320.18, $67.60, $2,673.58, and $462.66 for boat expenses for the taxable years or periods ending January 31, 1958, January 31, 1959, February 28, 1959, February 29, 1960 and February 28, 1961, respectively. Petitioner Ben Stein used the company boat far more than petitioner Harold Hibbard. The former would go to the boat almost every day after working a short time in the company's office. The boat was harbored in Chicago during the summer and Stein took it to Florida for the winter months in two of the years here in issue. Stein testified that he used the company boat for entertaining customers but could specifically recall entertaining only a buyer from the Futurian Manufacturing Co. and three othersalesmen. Stein estimated that the boat was used for company purposes 60 percent and for personal use 40 percent. To sustain *209 the claimed deduction for expenses connected with a boat it is incumbent upon a taxpayer to show that the ownership of the boat was an ordinary and necessary expense of his business. Section 162(a), I.R.C. 1954. As we noted in Challenge Manufacturing Co. 37 T.C. 650 (1962) at page 660: The deduction [for boat expenses claimed to be incurred for business entertainment purposes] is one that is peculiarly susceptible of abuse, and it has been decided that one claiming it must show a proximate relationship between the entertainment and the business of the taxpayer. [citations omitted] The possible fact that some of the persons aboard may have been helpful to Challenge in some circumstances hardly establishes that they were invited solely for business reasons, or that their entertainment was in any significant way responsible for any benefits accruing to the corporation. The taxpayer in American Lithofold Corp., 55 T.C. 904 (1971) shared the expenses of maintaining a 46-foot boat with another corporationboth of which were managed by the same persons. The taxpayer asserted that the expenses incurred were a joint effort by the two corporations to conduct a "business entertainment program" *210 in Florida. In upholding the Commissioner's disallowance of the taxpayer's expenditures in Florida we stated at page 922: To prevail here petitioner has the burden of showing that the substantial Florida expenses incurred by Robert J. Blauner, purportedly for business entertainment, in 1951 and 1952 were proximately related to its trade or business; it is not enough that there may be some remote or incidental connection. Ralph E. Larrabee, 33 T.C. 838 (1960). Petitioner must show that these expenses were prompted by business rather than by social reasons. Eugene H. Walet, Jr., 31 T.C. 461 (1958), affirmed per curiam 272 F. 2d 694 (C.A. 5, 1959). * * * The stipulated list of guests includes some individuals who were associated in one capacity or another with various customers of the petitioner. We do not find the evidence very helpful. The mere recital of the names of these "business" guests does not establish that their presence at Presque Rio was proximatelyrelated to petitioner's business. As we stated in Challenge Manufacturing Co., 37 T.C. 650, 659 (1962), "It is entirely normal for friendships to develop with some of those that one meets in business transactions." There is no *211 evidence that business discussions ever took place during the stay of these "business" guests at Presque Rio or aboard the Tara and we are left with the impression that none were ever intended. * * * 697 As in the American Lithofold case, in this case the meager and self-serving testimony of petitioner Ben Stein is not sufficient to show that the boat served any business purpose of Hibbard Dowel Co. We hold that Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. are not entitled to deduct any of the boat expenses as ordinary and necessary business expenses. Hibbard-Stein Enterprises and Hibbard Dowel Co. reported deductions in the amounts of $1,007.30, $1,331.25, $91.67, $1,294.58, and $1,062.22 for interest expenses for the taxable years or period ending January 31, 1958, January 31, 1959, February 28, 1959, February 29, 1960, and February 28, 1961, respectively. Respondent determined that these deductions were not allowable. Respondent'sfirst argument is that these expenses were, for the most part, interest expenses accrued in financing the boats and automobiles purchased by Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. Respondent asserts these purchases were not ordinary *212 and necessary business expenses of Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. and that, accordingly, the interest expense incurred in purchasing these items is not an ordinary and necessary business expense. Petitioners counter by asserting that there is no "business purpose" requirement for an interest deduction under section 163[6] and that the use to which the borrowed money is put is irrelevant. We need not decide whether this contention of petitioners is correct as an absolute rule of law. In this case, irrespective of the specific use of the borrowed funds, the overall result was to enlarge the funds available for the business operations of Hibbard Dowel Co. Accordingly, we find that the interest expense was properly deducted by Hibbard-Stein Enterprises and Hibbard Dowel Co. Hibbard-Stein Enterprises and Hibbard Dowel Co. reported deductions for depreciation of automobiles and boats in the following amounts for the following taxable periods: TYE/TPE
Boats
Automobiles
Jan. 31, 1958
$3,242.55
$4,897.36
Jan. 31, 1959
2,832.55
3,188.04
Feb. 28, 1959
236.05
90.62
Feb. 29, 1960
2,257.17
2,047.53
Feb. 28, 1961
611.32
1,688.70
Respondent *213 disallowed all these deductions. For the same reasons that we held none of the boat expense to be properly deductible and only one-third of the automobile expense to be deductible, we hold that none of the deductions representing boat depreciation and only one-third of the deductions claimed for automobile depreciation are allowable. During its fiscal year ended January 31, 1959, Hibbard Dowel Co. incurred and deducted boat and automobile insurance expenses in an amount of $1,847.68 and during the month ended February 28, 1959, in the amount of $149.87. Hibbard Dowel Co. during its fiscal year ended February 29, 1960, incurred and deducted boat and automobile insurance expenses in the amount of $3,850.23 and during the fiscal year ended February 28, 1961, in the amount of $1,936.52. The evidence presented by petitioners shows the combined accrued expenses for boat and automobile insurance but does not segregate the two accounts. The evidence also shows the cash disbursements made to three insurance agencies and from the testimony of Hibbard and the ledgers we are able to determine the amount of money paid out for automobile and boat insurance separately. Nevertheless, the evidence *214 presented by petitioners is not sufficient for us to separate the two accounts within the framework of the company's accrual system of accounting. We have held that the boat expenses were not ordinary and necessary expenses and likewise we find that the insurance expense for the boat was not an ordinary and necessary expense of the company, nor an ordinary and necessary cost of sales, as claimed by Hibbard Dowel Co. We have found that one-third of the costs incurred by Hibbard Dowel Co. in connection with its use of company automobiles was for business purposes and consequently deductible. Likewise, we find the same fraction for automobile insurance expense to represent deductible business expenses. Since the evidence is not sufficient to show precisely the amount of the totalaccrued automobile insurance expense for the periods in question, we consider it appropriate to make the best approximation of the amount which the evidence warrants. For the fiscal year ended January 31, 1959, 698 Hibbard-Stein Enterprises paid out $449.40 for automobile insurance and $1,612.12 for boat insurance, or in percentage terms 21.8 percent of the cash disbursed for insurance in that period was for automobile *215 insurance. Applying this percentage to the amount of automobile and boat insurance expense incurred during its fiscal year ended January 31, 1959, we find that the partnership incurred automobile insurance expenses for that period in the amount of $402.79. Of that sum only $134.26 or one-third is properly deductible as a business expense. Although no funds were disbursed by the partnership in February 1959 for automobile or boat insurance, the partnership incurred $149.87 in such expenses for that month. We again find that 21.8 percent of that amount or $32.67 was for automobile insurance expense and that $10.89 or onethird is properly deductible as a business expense. For the fiscal year ended February 29, 1960, Hibbard Dowel Co., Inc. expended $398.75 forautomobile insurance premiums, $1,146.74 for boat insurance premiums and $2,462.15 for workmen's compensation insurance premiums. The corporation incurred [7] *216 $3,850.23 in insurance expenses for that same fiscal year. We find that the latter sum is composed of the following: Workmen's compensation
41.4%
$2,364.04
Automobile insurance
9.9%
381.17
Boat insurance
28.7%
1,105.02
All of the workmen's compensation insurance expense is properly deductible and one-third of the automobile insurance or $127.06 is deductible as an ordinary and necessary expense of the corporation. None of the boat insurance expense is deductible. For the fiscal year ended February 28, 1961, Hibbard Dowel Co. incurred expenses of $1,936.52 for boat and automobile insurance. During this same period the corporation paid out $241.80 for automobile insurance premiums and $1,311.67 for boat insurance premiums. We find as a fact that of the total sum of $1,936.52, theamount of $302.08 represents automobile insurance expense, of which one-third or $100.69 is properly deductible. None of the boat insurance is deductible. Hibbard-Stein Enterprises and Hibbard Dowel Co. claimed deductions for business promotion expenses in the amounts of $6,339.85, $5,039.61, $339.92, $4,965.31, and $2,248.47 for the taxable years or periods ending January 31, 1958, January 31, 1959, February 28, 1959, February 29, 1960, and February 28, 1961, respectively. Respondent *217 disallowed in full these claimed deductions. Petitioner Ben Stein testified that his duties with the dowel business consisted of soliciting new business and calling on the local accounts in Chicago. He had no connection with the manufacturing operations of the business. When furniturs shows were held (presumably in Chicago), he entertained the customers and salesmen. Entertainment of customers was usually conducted in restaurants and taverns and the bills were charged to the Hibbard Dowel Co. Stein admits that he charged some personal meals to the business. However, he asserts that the "bulk of the charges was for business purposes. On brief, petitioners Ben and Sylvia Stein assert that the rulein Cohan v. Commissioner, supra, should be applied and that 60 percent of the promotion expenses should be allowed. Respondent asserts that petitioner Stein failed to identify a single person entertained and the business purpose of any such entertainment. The record reasonably substantiates that the expenses were incurred in the amounts claimed by Hibbard Dowel Co., but we agree with respondent that there is a paucity of evidence to support an allowance in any amount as being an expenditure *218 for business purposes. As we noted in our discussion of the boat expenses, entertainment expenses are peculiarly susceptible of abuse. Challenge Manufacturing Co., supra. Although the strict substantiation requirements of section 274 do not apply to the year here in issue, the purpose of the expenditure must be shown to be primarily business rather than personal for the amount to be deductible. As Stein asserts, it is a business custom to entertain prospective customers from out-of-town, especially during conventions or trade fairs. Consequently, we conclude that 10 percent of the amounts claimed to be deductible for entertainment is an allowable deduction. Thisfigure is our best estimate from the meager evidence in this 699 case of the deductible business expense of Hibbard Dowel Co. for entertainment or business promotion. Cohan v. Commissioner, supra. Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc. reported deductions for bad debts in the amounts of $2,357.90, $4,693, $1,299.12 and $1,334.92 for their taxable years ending January 31, 1958, January 31, 1959, February 29, 1960, and February 28, 1961, respectively. Respondent determined that none of these were allowable deductions. *219 Petitioners have failed to establish that Hibbard Dowel Co. sustained any deductible bad debt other than a loss of $140.10 during its taxable year ending January 31, 1959 resulting from a salesman in Puerto Rico absconding with certain company funds Accordingly, we sustain respondent in his disallowance of all the other claimed deductions for bad debt losses. Having made our determination of the extent to which gross receipts from sales were understated and the cost of goods sold and expenses were overstated by Hibbard-Stein Enterprises and Hibbard Dowel Company, Inc. the individaual liability of the petitioners still remains to bedetermined. Ben Stein and Harold Hibbard each concedes that he is taxable on one-half of the corrected ordinary income of Hibbard-Stein Enterprises and we so find. Harold Hibbard concedes that he is taxable on his one-half share of the corrected taxable income of Hibbard Dowel Co., Inc. Petitioner Ben Stein, however, asserts that he is not liable for any amount greater than he and Sylvia Stein reported because, he asserts Harold Hibbard embezzled all of the proceeds of the unreported sales, both identified and unidentified and that he suffered a loss from *220 embezzlement in the year he discovered this alleged defalcation, 1960. This loss he contends would offset the additional income from unreported sales in 1959 and 1960. As we have heretofore stated we do not accept Stein's contention as to Hibbard's embezzlement of Hibbard Dowel Co. funds. Stein had control over the finances of Hibbard Dowel Co. and National Maintenance. Harold Hibbard acted on the direction and the prompting of Ben Stein. Nor can we accept Stein's theory that Harold Hibbard and Louis Novinson were conspiring to steal funds from Hibbard Dowel Co. Novinson was under the control of Ben Stein. There is absolutelyno credible evidence which would link Hibbard with Novinson. By use of poor accounting techniques, dummy corporations and multiple bank accounts, Ben Stein attempted to camouflage the magnitude of the operations at Hibbard Dowel Co. Neither Harold Hibbard nor Ben Stein was able to adequately explain away the existence of the bank deposits and the credits with no debits. We find that the evidence clearly shows that Ben Stein and Harold Hibbard, acting together, deliberately understated the amount of the gross receipts of Hibbard Dowel Co. Accordingly, we find that *221 petitioners Ben and Sylvia Stein understated their income from Hibbard-Stein Enterprises and Hibbard Dowel Co., Inc., by their one-half distributive share of the income of those businesses. We also find that Harold and Ethel Hibbard understated their taxable income received from Hibbard-Stein Enterprises and from Hibbard Dowel Co., Inc., in the amount of their one-half distributive share of those businesses for the years 1958 and 1961. Stein's Income from National Maintenance National Maintenance was a business which supplied temporary labor to various Chicago industries. The evidence discloses that Ben Stein hadthe ultimate control over the company because he financed its operations. Although Louis Novinson operated the company and took care of day-to-day details, Stein had control over the company and we find his denials of knowing that sums were credited to his account totally unbelievable. Respondent has determined that Stein received taxable income from National Maintenance as a result of various credits to his personal account on the books of that corporation. Respondent, however, has included certain items in Stein's income which are mere transfers of funds from one corporation *222 to another. Where the evidence reasonably shows that an account of Ben Stein's has been properly debited when a withdrawal of funds has been made, we have not included these sums in his income. During the taxable year 1959 Ben Stein's personal account was credited with the amount of $8,896.01 representing the proceeds of checks drawn by National Maintenance on its unrecorded bank account and deposited in its recorded bank account and 700 entered on its cash receipts journal as amounts received from Ben Stein. The evidence shows that Stein drew upon these funds credited to his account. On brief, Steincontends that the items coming from the unrecorded bank account do not represent income of Hibbard Dowel Co. which was diverted to that account but in all likelihood represent unreported income of National Maintenance which Novinson caused to be deposited in that account. Stein professes no knowledge of why his account was credited. In our opinion Stein has not shown by credible evidence that the funds transferred from the unrecorded bank account of National Maintenance were his personal loans to National Maintenance. If Stein had made loans to National Maintenance, his account would have *223 been credited at the time of the loan and not at the time of the transfer from one bank account to another. The evidence as a whole does not support any conclusion other than that these amounts were not personal loans from Stein to National Maintenance. By his use of these funds, Ben Stein received taxable income. Accordingly, we find that Stein received taxable income in the amount of $8,896.01 in his taxable year 1959 from credits to his personal account with National Maintenance which he failed to report. For the same reasons we conclude that Stein received taxable income in his taxable years 1960and 1961 in the amounts of $10,500 and $2,800, respectively from credits to his personal account on the books of National Maintenance Corporation of checks drawn by National Maintenance on its unrecorded bank account. Respondent also determined that Stein received $23,300 in 1959 as a result of checks in that amount drawn on the All Work Co. checking account being deposited in the recorded bank account of National Maintenance. The cash receipts journal of National Maintenance lists Ben Stein as the source of these funds. Checks in the total amount of $16,800 comprising a portion of the *224 $23,300 in issue were in fact transfers of funds not giving rise to taxable income to anyone. These fund transfers consisted of funds advanced by Hibbard Dowel Co. to either Stein personally or to the All-Work Co., his firm which was nothing more than a corporate shell with a bank account. Proper debit entries were made on the books of Hibbard Dowel Co. for these advances. Stein deposited these Hibbard Dowel Co. checks in the All-Work bank account and drew checks in the same amount on the All-Work account payable to National Maintenance. When Stein advanced the funds to National Maintenance in theform of the aforementioned All-Work checks he was credited with the amount. The evidence does not show the source of the deposits of the remaining $6,500 in the All-Work bank account. The money comprising the $6,500 came from some unexplained source and went in and out of the All-Work bank account and into National Maintenance as a credit to Ben Stein. Since there is no evidence to show that the items constituting this $6,500 did not constitute income to Ben Stein, we find that these items did constitute taxable income to Ben Stein for the year 1959. Respondent determined that Stein received *225 taxable income in the years 1959, 1960 and 1961 as a result of his account with National Maintenance being credited with currency deposits in the following amounts: Year
Amount
1959
$4,900.00
1960
6,250.40
1961
7,568.36 Petitioner Stein testified that he often madee currency deposits. For the taxable year 1959, the evidence shows that Stein was issued company checks on May 25 and May 29 totaling $2,320 which he cashed at various currency exchanges in Chicago. On June 9, 1959 Stein redeposited $1,000 in currency with National Maintenance. We believe this evidence issufficient to show the source of the $1,000 deposit in question and consequently determine that this amount was not taxable income of Ben Stein. There is no evidence to support a similar conclusion for any of the other amounts deposited in 1959. Accordingly, we find that for the year 1959, Ben Stein received $3,900 as a result of unexplained currency deposits. Respondent determined that Stein received taxable income in the amount of $6,250.40 in 1960 as a result of his personal account being credited with unexplained deposits of currency and other items. One of these items is a check from Hibbard Dowel Co. to Ben Stein in the amount *226 of $250 dated August 15, 1960. This amount was debited to Stein's personal account with Hibbard Dowel Co. and is nothing more than a transfer of funds. It is not taxable income to Ben Stein. None of the other credit entries 701 can be so explained, however, and in the absence of a satisfactory explanation we find that credits in the amount of $6,000.40 resulting from these unexplained entries was taxable income to Ben Stein in the year 1960. For the taxable year 1961 respondent determined that Ben Stein received taxable income in the amount of $7,568.36as a result of this amount being credited to his personal account with National Maintenance, following deposits of unexplained funds. One item comprising this amount is a deposit of $525 in currency on September 29, 1961. On September 27, 1961 Ben Stein was issued a check by National Maintenance in the amount of $775 which he cashed at a currency exchange. We find this evidence sufficient to explain the source of the $525 deposit. No other items, however, are explained by the evidence and accordingly we find that Ben Stein received taxable income in 1961 in the amount of $7,043.36 as a result of these unexplained deposits credited to *227 his personal account. Respondent determined that petitioner Ben Stein received taxable income in the amount of $600 and $4,000 for the years 1959 and 1960, respectively, as the result of his personal account with National Maintenance being credited with the proceeds of checks received from Hibbard Dowel Co. and deposited in the recorded National Maintenance bank account. The evidence is clear that Ben Stein received $600 taxable income in the year 1959 from this source. The funds were transferred from Hibbard Dowel Co. and credited to Ben Stein onthe books of National Maintenance but debited to "Bon Soir" on the books of Hibbard Dowel Co. This same scheme was repeated in 1960 on February 1 and March 1 for a total amount of $1,400. A credit of $1,500 on March 2, 1960 on the books of National Maintenance differed in that there was a debit entry on the books of Hibbard Dowel Co. for "Loans Receivable - Ben Stein." This transaction did not give rise to taxable income to Ben Stein. The next credit entry dated March 31, 1960 was similar to those of February 1 and March 1 in that "Bon Soir" was debited on the books of Hibbard Dowel Co. This transaction produced taxable income for Ben Stein *228 in the amount of $700. The last entry dated June 23, 1960 shows a debit to National Maintenance on the books of Hibbard Dowel Co. and a credit to Ben Stein on the books of National Maintenance. This transaction also produced taxable income for Ben Stein. Stein's protestations that the credit entries were made without his knowledge or consent is not convincing. Accordingly, we find that from these transactions Ben Stein received income of $600 in 1959 and $2,500 in 1960. Respondent determined that Ben Stein received taxable income in the amountsof $4,828.55 and $4,925.02 in the years 1959 and 1960, respectively, as a result of his personal account with National Maintenance being credited with the proceeds from checks of customers of National Maintenance in payment of unrecorded and unreported sales. There is no evidence to refute this determination. We are not persuaded that these amounts were credited to Ben Stein's account without his knowledge. Stein's theory that these amounts must be considered to be "commissions" and therefore not taxable in the year earned but in the year withdrawn, Sivley v. Commissioner, 75 F. 2d 916 (C.A. 1935) affirming a Memorandum Opinion of this Court *229 [Dec. 8357-F] is without basis. The evidence clearly shows that after each credit entry but during the same year an amount greater than the credit was debited to Ben Stein's account with National Maintenance. Petitioner has the burden of showing that the sums representing "commissions" were separated and were not drawn upon during the taxable years in which credited. Stein has not shown this to be the case. Accordingly, we find that Stein received taxable income of $4,828.55 and $4,925.02 in the years 1959 and 1960 as a resultof his being credited with amounts representing unrecorded sales of National Maintenance. In summary, petitioner Ben Stein received taxable income as a result of credits to his personal account on the books of National Maintenance in his taxable years 1959, 1960, and 1961 in the following amounts: Year
Amount
1959
$24,724.56
1960
23,925.42
1961
9,843.36
Management Fees from Metropolitan Fair For the year 1961, petitioner Ben Stein reported income from Metropolitan Fair & Exposition Authority in the amount of $5,557.42. Respondent determined that he understated his income from this source by the amount of $9,922.63. This latter amount 702 is the sum of six checks paid *230 by Metropolitan Fair to either National Maintenance or Ben Stein for management fees less the amount reported by Ben and Sylvia Stein. National Maintenance received two checks from Metropolitan Fair totaling $7,405.53 which were deposited in its bank account and credited to Ben Stein's personal account as management fees. These amounts were subject to being drawn upon by Ben Stein and constituted taxable income to him. Of the $9,922.63 which respondent determined was includable inBen Stein's income from Metropolitan Fair, $2,500 represented that portion of a check in the amount of $12,858.21 from Metropolitan Fair charged by National Maintenance to management fees. The remainder of the $12,858.21 check represented wages and unemployment insurance of temporary labor supplied by National Maintenance. No credit entry was made to Ben Stein's personal account for any part of the $12,858.21 check. He could not draw upon any of the $2,500 determined by respondent to be included in his income. The entire amount of the check for $12,858.21 (plus a small allowance) was credited to the Metropolitan Fair account on the books of National Maintenance. Accordingly, we find that no part of this $2,500 *231 was taxable income to Ben Stein. Finally, Ben and Sylvia Stein made an arithmetical error in totaling the checks made payable to Ben Stein. The error was in the amount of $17.10 and their income as reported from Metropolitan Fair should be increased by this amount. We, therefore, find that Ben Stein understated his taxable income in 1961 from Metropolitan Fair by the amount of $7,422.63. For his taxable year 1962, Ben Stein reported as taxable income the proceeds of twochecks totaling $5,118.43 he received from Metropolitan Fair. In addition he received three other checks totaling $12,108.89 which he endorsed over to National Stevedoring. This latter amount was not credited to Ben Stein's personal account with National Stevedoring but respondent determined that Stein understated his income for his taxable year 1962 by the amount of this $12,108.89. We agree with respondent. Stein was under no legal obligation to transfer the funds in dispute to National Stevedoring. Furthermore, the invoices sent to Metropolitan Fair usually stated who was supplying the management services. In any event, if Stein was not to be the recipient of this income, he could easily have instructed Metropolitan *232 Fair to draw the checks in favor of National Stevedoring rather than Ben Stein. Accordingly, we find that Ben Stein understated his income from Metropolitan Fair by $12,108.89 in 1962. Income of Stein from Exposition Service Respondent determined that Ben Stein received and failed to report taxable income in his taxable year 1959 in the amount of $13,313.82 as a result of his personal account with National Maintenance being credited with that amount in connectionwith an account entitled,"Exposition Service." The amount in dispute is composed of three items. The first is a credit entry to Ben Stein's account in the amount of $255.65. The evidence shows that Exposition Service required large amounts of funds to begin operations and National Maintenance provided these funds. One of the sources of funds from which National Maintenance provided these funds was a bank loan of $8,000 from the South East National Bank of Chicago. As bills for expenses incurred by Exposition Service would be paid, National Maintenance would debit the Exposition Service account and credit cash. On January 20, 1959, interest in the amount of $255.65 was due on the loan of $8,000 and National Maintenance paid *233 the bank this interest charge. Rather than charging the interest as its own expense, it debited the interest cost to the Exposition Service account. On March 19, 1959, Ben Stein personally assumed the loan and his account was credited in the amount of $8,000 and the loan payable account was extinguished. Respondent determined that the facts show that the $8,000 loan was a personal loan for Ben Stein and that he received income in the amount of $255.65 when NationalMaintenance paid his personal obligation. We view the facts otherwise. The loan did not become a personal obligation of Ben Stein until he assumed it on March 19, 1959. Prior to that date it was a corporate obligation of National Maintenance and Ben Stein was not receiving any benefit from the loan. We find that the amount of 703 $255.65 was not taxable income to Ben Stein. The second item is a credit to Stein's account on the books of National Maintenance under the designation "Exposition Service" in the amount of $6,975 under date of February 24, 1959. National Maintenance issued a check in this amount to Jerry Jordan who endorsed it over to Ben Stein. Ben Stein stated that Jerry Jordan owed him money and that this was *234 a payment on that debt. There is no corroborating evidence of Stein's testimony even though Stein stated that Jerry Jordan was in Chicago and could be called as a witness. Petitioner Stein's failure to elicit testimony from Jordan leaves only his own testimony with respect to this item and we find this testimony unconvincing. Accordingly, we find this item was taxable income to Ben Stein in 1959. The third item determined by respondent to be taxable incometo Ben Stein with respect to the "Exposition Service" account was a credit of $6,083.17 to Stein's personal account with National Maintenance on August 31, 1959. This credit was entered as part of a closing entry to the Exposition Service account. Ben Stein withdrew more than this amount from his account with National Maintenance during the remainder of 1959 so there is no merit to his argument that he had no benefit from these funds. We are persuaded that he was cognizant that the amount was credited to his account even though he contends otherwise. He took the money for his own use and in our vie3 it constitutes taxable income to him. Accordingly, we find that petitioners Ben and Sylvia Stein received taxable income in the year *235 1959 in the amount of $13,058.17 from the credit to his account on the books of National Maintenance in connection with the account entitled, "Exposition Service." Income of Stein from Best Sanitation Respondent determined that Ben Stein received taxable income in the year 1960 as a result of a transaction in which National Maintenance issued a check in the amounnt of $5,000 payable to a Frank W. Pesce. The miscellaneous receivables account of NationalMaintenance was debited in that amount. The check was endorsed by Frank W. Pesce and Best Sanitation and Supply Co. Stein testified that he received $5,000 from Best Sanitation in repayment of a loan. There is no evidence that Best Sanitation was a company controlled by Ben Stein. However, the miscellaneous receivables ledger account of National Maintenance shows that credit had been extended to Best Sanitation in the amount of $2,500 and this debt was promptly paid. The $5,000 "debt" here in issue was never repaid to National Maintenance. Accordingly, we find that there was a removal of corporate funds by Ben Stein in the amount of $5,000 through the guise of a "loan" to Frank W. Pesce and Best Sanitation. The amount constitutes taxable *236 income in Stein's taxable year 1960. Income of Stein from Ace Duct Respondent determined that Stein received taxable income in the taxable year 1960 as a result of his receipt of $1,000 on July 21, 1960, of a check from National Maintenance. The miscellaneous receivables account of National Maintenance was debited in that amount with the following entry "Ben Stein - ADC." There are no debit entries reflecting transactions between BenStein and National Maintenance in the miscellaneous receivables account after July 21, 1960, and only one credit entry after that date. As of the middle of 1961, the National Maintenance miscellaneous receivables ledger showed that Ben Stein owed National Maintenance $1,651.33. Respondent contends that the above-describedd transaction involves sums received by Ben Stein from a certain Ace Duct Corporation (ADC). We do not consider respondent's contention in this respect to be correct. It appears to us that there was a proper debit entry made to Ben Stein's account and that the debt owed by Stein to National Maintenance was valid throughout 1960. If Ben Stein received any income from this transaction, it was during his taxable year 1961 when National Maintenance *237 ceased doing business. Accordingly, we find that this item did not constitute taxable income to Ben Stein in 1960, nor because of our further findings with respect to transactions occurring on the dissolution of National Maintenance, income in any other year. Respondent determined that Stein received taxable income in the amount of $31,995.61 in the year 1962 as a result of withdrawing assets of that value upon the dissolutionof National Maintenance. 704 In March 1961 a William Gottlieb made a personal loan to Ben Stein of $25,000. Ben Stein endorsed the check over to National Maintenance and Stein was credited with the same amount in his personal account. As a result Ben Stein, not National Maintenance, owed Gottlieb $25,000. When National Maintenance went defunct, petitioner Stein had a credit balance of $3,099.75 in his personal account. He then withdrew $31,995.61 in assets from National Maintenance consisting of notes of the Morrison Hotel Crop. worth $25,000 and trade receivables worth $6,995.61. Stein transferred the Morrison Hotel notes to Gottlieb in satisfaction of his personal debt. He then transferred the trade receivables to his wholly-owned corporation, National Stevedoring. *238 Petitioner Stein alleges that shortly thereafter he paid certain corporate debts of National Maintenance with his own funds. According to Stein, these debts amounted to $22,000. There is no credible evidence to prove the existence and amount of the corporate debts of National Maintenance in 1962. Therefore there is no evidence to support Stein's contention that he merely assumed the corporate liabilitiesof National Maintenance and was compensated for so doing by receiving notes and trade accounts receivable. We find no convincing evidence of any corporate debts of National Maintenance. The ledger sheets introduced by petitioner were not posted after June 1961 and have no probative value with respect to the existence of debts in 1962. Accordingly, there is no evidence to warrant a deduction of the $31,995.61 except for the amount of the excess of Stein's credit balance in his personal account over his debit balance in the miscellaneous receivables account. By reducing the amount withdrawn by Stein by this amount, we find that Stein received taxable income in the year 1962 in the amount of $30,547.19 upon the dissolution of National Maintenance Corp. Income of Stein from National Stevedoring *239 Respondent included in Stein's income for his taxable years 1962 and 1963 the amounts of $9,220.63 and $6,022.23, repreresenting expenditures made by National Stevedoring Service to or on behalf of Ben Stein. Although respondent included these items in Stein's income for 1962 and 1963, the expenditures were made in 1961, 1962, and 1963. The evidence clearly shows when each expenditurewas made. The following schedule indicates the totals for each calendar year: Item
1961
1962
1963
Travel
$ 20.00
$ 2,880.85
$ 0.00
Entertainment
1,453.03
Promotion
1,241.73
5,991.86
1,400.93
Hospitalization insurance
63.14
243.80
97.52
Sam Stein's salary
1,100.00
750.00
Total
$2,777.90
$10,216.51
$2,248.45 Respondent has not determined or amended his answer to claim that any amount is includable in Stein's income for 1961 for payments made on his behalf by National Stevedoring. We, therefore, do not consider this issue for this year. National Stevedoring expended $8,872.71 in 1962 which it charged to travel and entertainment. There is no showing that any of these expenditures were properly deductible business expenses. This fact, of course, does not, standing alone, mean that the items were for the benefit of Ben Stein. However, *240 the burden is on petitioner to show otherwise, and he has failed to make such a showing except as to the purchase of a directory of Illinois manufacturers. This item cost $31.20 and was included in promotion expenses. The hospitalization insurance premiums were clearly payments made for Stein's benefitand there is no evidence that they were paid pursuant to any plan which would permit their deduction by National Stevedoring. See Section 105. The salary paid to Sam Stein, Ben Stein's father, was properly included in Ben Stein's income. Sam Stein's widow testified that Sam could not work during 1962 or 1963. Accordingly, any amount paid 705 him by National Stevedoring was solely for the benefit of Ben who was supporting his mother and father in 1962 and 1963. In calendar year 1963 the only item which the evidence shows was not for the benefit of Ben Stein was a bill for turkeys in the amount of $339.64. The evidence shows that the turkeys purchased with this payment were given to customers. Stein has failed to show that any of the other items were not for his benefit. Accordingly, we find that petitioner Ben Stein received taxable income in the years 1962 and 1963 as a result of expenditures *241 made on his behalf by National Stevedoring in the amounts of $10,185.31 and $1,908.91, respectively. Respondent determined that Stein received taxable income in the amount of $68,098.57, now conceded by him to be only $47,398.57, during 1962 and $12,509.31 in 1963 as a result of sumstotaling these amounts being deposited in the bank account of National Stevedoring and credited to Stein's personal account. These amounts were included by respondent in Stein's account for 1962 and 1963 although in fact the deposits and corresponding credit entries were made in the following amounts in the calendar years 1961, 1962, and 1963. Year
Amount
1961
$40,287.11
1962
16,470.77
1963
3,150.00 Since respondent has made no claim that Stein's income for 1961 should be increased by income from payments made for him by National Stevedoring, we have no issue in this respect. Stein asserts that he has shown that the majority of the items making up these amounts were transfers of funds from his accounts in other corporations to his account with National Stevedoring. Accordingly, he asserts that having shown that respondent's determination was in error in large part, respondent should bear the burden of proving *242 that any of the items were in fact income to Ben Stein. We do not agree with Stein because in our view he has not in fact shown respondent's determination to be erroneous except for a few specific items. There were items totaling $18,000 which weredeposited in 1961 which were intercorporate transfers but this item for this year is not properly before us. Only one item in the amount of $2,000 deposited in 1962 was shown to be a transfer of funds. For the calendar year 1962 respondent has included in Ben Stein's income the proceeds of deposits in National Stevedoring's bank account totaling $16,470.77. We have considered that only one item was incorrectly included in Stein's income - a check from Hibbard Dowel Co. in the amount of $2,000 in which Stein's account with Hibbard Dowel Co. was debited and National Stevedoring did in fact receive the funds. The other items fall into three categories: (1) Midwest Maintenance would issue a check payable to Ben Stein and would debit his account, yet there is no evidence these funds reached National Stevedoring; (2) Midwest Maintenance would issue a check payable to National Stevedoring and Ben Stein would receive a credit to his account with *243 the latter company. There is no evidence of any entry such as a debit to Stein's account with Midwest Maintenance or an account receivable entry; (3) Hibbard Dowel Co. would issue a check payable to Stein but fail to debit his account. Ben Steinreceived taxable income as a result of each of these transactions. We find that in the calendar year 1962 he received $14,470.77 as a result of credits to his account with National Stevedoring. For the same reasons stated with respect to the year 1962, we find that Ben Stein received taxable income from the National Stevedoring account in his taxable year 1963 in the amount of $3,150. Petitioners Ben and Sylvia Stein reported a long-term capital gain of $1,631.22 on their joint return for 1963 reflecting gain realized from the sale of Ben Stein's 10 shares of National Stevedoring stock to Mike M. Kamberos. Respondent asserts that Stein received $19,960.72 for the 10 shares as opposed to the $2,631.22 as reported. Stein contends that the $2,631.22 represents the sales price for the stock after deducting from the amount he received from Kamberos the amount of the corporate liabilities he assumed. Stein says that Kamberos was in effect augmenting *244 the surplus account of National Stevedoring with his own funds by paying Stein an amount for the stock with the agreement that Stein assume the corporate liabilities. The weakness in Stein's position is that there is no credible evidenceof the 706 amount of the corporate liabilities which Stein assumed, if any. There is no evidence from which we might even approximate the amount of such liabilities, if any. In the absence of this essential evidence, we conclude that the amount realized by Stein upon the sale of his stock was $19,960.72 and that his long-term capital gain was $18,960.72. The Steins understated their capital gain by the amount of $17,329.50 for the year 1963. Since Ben and Sylvia Stein have conceded on brief that they understated their income in 1962 and 1963 by the amounts of $10,376.13 and $13,964.57, respectively, as a result of expenditures made on behalf of Ben Stein by Midwest [Maintenance,] [the] only remaining issue involving Stein's income from dealings with this corporation concerns credits to Ben Stein's personal account with Midwest Maintenance. Respondent included the disputed credits in Ben Stein's income in 1962 and 1963 whereas in fact the deposits and *245 credit entries were made in 1961, 1962, and 1963. Stein asserts he has traced the majority of the items in question to intercorporate transfers of funds from Hibbard Dowel Co., National Maintenance, and National Stevedoringto Midwest Maintenance. We do not find this to be the case. We find no credit item entered in 1961 which was endorsed over to Midwest Maintenance. No cancelled checks were introduced which would show that Midwest Maintenance did in fact receive the income from either other corporations or from Ben Stein's presonal checking account. Several supposed sources of these items are nowhere shown in the evidence in this case. One item which we believe was shown to be adequately traced was the loan by William Gottlieb to Ben Stein of $25,000. We do not think that he was a "frontman" for Ben Stein and we have concluded that the money he lent Ben Stein was his own and not amounts from unreported sales of services by Midwest Maintenance. Stein has cited several cases which he asserts show that respondent should bear the burden of proof. We find these cases inapposite because Stein has not established the necessary predicate of showing that respondent's determination was arbitrary *246 or based on a basically erroneous report of his agents. Accordingly, we find that Ben Stein received taxable income in the years 1962 and 1963 as a result of the unexplained credits to his account with Midwest Maintenancein the amounts of $26,480.10 and $5,172.33, respectively. A fire destroyed Ben and Sylvia Stein's apartment on November 22, 1963. The Steins claimed that the value of their belongings which were destroyed was $66,898.20. Respondent determined that their loss, over and above the $100 limitation prescribed by section 165(c)(3), was no greater than their recovery from their insurer and hence they suffered no allowable casualty loss. The Steins recovered $21,192.48 from their insurer after having paid out $2,354.72 for an adjuster's report of loss. Petitioners, of course, have the burden of proving that the loss caused by the fire and not reimbursed by the insurer was greater than the amount allowed by respondent. Helvering v. Owens, 305 U.S. 468 (1939). The issue here is the narrow one of a determination of the fair market value of the contents of the apartment immediately prior to the fire. The evidence clearly shows that all the contents of the apartment were destroyed *247 by fire and the amount of the insurance reimbursement received by the Steins. We recently faced this identical issue in Edmund W. Cornelius, 56 T.C. 976 (1971). There we stated thatthe term, "fair market value" of household goods was their cost less their depreciation in value. In the Cornelius case we held that in determining the value of household contents at the time of the fire, we woule apply the "so-called 'broad evidence' or McAnarney rule to determine the actual value * * *." We then proceeded to determine the fair market value of the household contents on the basis of their cost less a "fair and reasonable" depreciation factor. As we have set forth in our findings, the determination of the adjusters that the loss of unscheduled personal property by the Steins was $65,151 is fair and reasonable. The reduction of the amount claimed, $85,907.70, by $20,756.70, representing overestimates and depreciation, is within the 20 to 25 percent range accepted in the Cornelius case. This value is also supported by the testimony of an interior decorator who did work in redecorating the Steins' apartment in 1961. The evidence shows that the insurer, Lloyds of London, inspected the Steins' *248 707 apartment for about 5 minutes following the fire and declared it a total loss. This fact indicated that the $2,354.72 which the Steins paid to the adjusters was not inconnection with recovering any proceeds from the insurer but was for the purpose of perfecting the claim for a deduction for income tax purposes. Such an expense is deductible as an expense to determine income tax liability. Section 212. See also Rev. Rul. 58-180, 1958-1 C.B. 153. We find petitioners Ben and Sylvia Stein have presented sufficient evidence to show that they did in fact sustain a casualty loss in 1963 uncompensated for by insurance in the amount of $43,958.52 and are also entitled to deduct the $2,354.72 paid the insurance adjuster. On their 1958 Federal income tax return petitioners Ben and Sylvia Stein claimed charitable contribution deductions of $1,325.50. This sum was composed of one-half of the alleged contributions of the Hibbard-Stein partnership of $586.50, a contribution of $639 to the Anshe Mizrach Congregation, and $100 miscellaneous contributions. The extremely vague testimony by Ben Stein regarding the miscellaneous contributions does not support an allowance of such claimed deductions *249 and we sustain respondent's disallowance thereof. The ledger of Hibbard-Stein shows only two contributions, one to the Hadassah for $10 and one to theChicago Policemen's Benevolent Association for $5. This latter contribution was debited to the miscellaneous expenses account and respondent has conceded that these deductions are proper in computing the partnership income. Accordingly, we find that the partnership made contributions of $10 rather than $1,173 as claimed by the Steins. Petitioners Ben and Sylvia Stein are allowed $5 of that sum as a charitable contribution. Stein testified that he had contributed to the Anshe Mizrach Congregation for many years and there is proof that he gave $645 in 1963 to that synagogue. We consider the evidence as a whole sufficient to show that the Steins did in fact make a contribution of $639 in 1958 to the Anshe Mizrach Congregation. We hold that for the year 1958 petitioners Ben and Sylvia Stein are entitled to deduct $644 for charitable contributions. On their 1961 Federal income tax return petitioners Ben and Sylvia Stein deducted $600 for charitable contributions. These were composed of a $500 contribution to the Anshe Mizrach Congregation *250 and $100 in miscellaneous contributions. We find that the Steins did make charitable contributions in the year 1961 in the amount of $500 to the AnsheMizrach Congregation and are entitled to deduct that amount on their joint return for 1961. There is no evidence to support the claimed miscellaneous contributions of $100. On their 1963 income tax return, petitioners Ben and Sylvia Stein claimed charitable contribution deductions of $840. Petitioners had cancelled checks payable to charitable organizations totaling $650. We find that the Steins are entitled to deduct the amount of $650 as charitable contributions for 1963 but have failed to substantiate the balance of their claimed deduction. We need not determine the issue involving medical expenses because it is apparent from our findings that the total amount of medical expenses reported by petitioners Ben and Sylvia Stein did not, for any year in issue, exceed 3 percent of their adjusted gross income. In light of our determinations with respect to unreported income of Ben and Sylvia Stein, we find that the amounts claimed as itemized deductions for State sales taxes are reasonable and are properly deductible. However, it appears *251 that the Steins will receive greater benefit from the standard deduction of $1,000 in all years except 1963. On their joint Federal income taxreturns filed for the taxable years 1958, 1959, and 1960, petitioners Ben and Sylvia Stein claimed dependency exemptions for Ben's parents, Reba and Sam Stein, in the amount of $600 for each. Respondent determined that petitioners were not entitled to these claimed exemptions. During the years 1958, 1959, and 1960 Sam Stein received wages from National Maintenance in the amounts of $1,000, $1,285, and $1,500, respectively. These amounts were charged to the transportation expense account of National Maintenance. During these same years Sam and Reba Stein received $240 per month in Social Security payments. Section 151(e) allows to a taxpayer an exemption of $600 for each dependent whose gross income is less than $600 per year. The evidence clearly shows that Sam Stein had a gross income in each of the years in issue in an amount greater than $600. Therefore, the dependency exemption for Sam Stein was properly disallowed. 708 Petitioner Ben and Sylvia Stein failed to present any evidence showing whether Sam and Reba Stein joint or separate income *252 tax returns for the years in issue. No exemption shall be allowed under section 151(e) for any dependent who has made a joint returnwith his spouse. Accordingly, respondent properly disallowed both dependency exemptions for these years. Loss by Hibbards on Sale of Oak Street Property. Respendent determined that petitioners Harold and Ethel Hibbard understated their taxable income in the year 1961 by claiming a loss on the sale of one-half of the beneficial interest in a building in Chicago referred to as the Oak Street property. Respondent contends the Hibbards incorrectly reported both the cost and selling price for the building on Oak Street but has not questioned the figure for depreciation allowed of $4,802.67 as shown on their joint income tax return. The Hibbards reported the basis of the building as being $42,227.53. The evidence as a whole shows that the cost of the building to Hibbard was $36,000. Hibbard, however, contends that the additional amount comprising the reported basis of the building, $6,227.53, reflects improvements made to the structure. Hibbard testified that he obtained the figures he entered on his return from an accountant. This is the only evidence to show *253 a cost of the building in excess of $36,000. Since in our view this evidence is insufficient to show the cost, if any, ofimprovements to the building, we find that the cost of this property was $36,000. In payment for the property, Hibbard received $5,000 cash and a noninterest-bearing note in the amount of $31,000 due in 10 years. Hibbard valued the note at $22,000. It is well established that the present value of a dollar due at some time in the future decreases as the maturity date is postponed. John Q. Shunk, 10 T.C. 293, 305 (1948), AFFIRMED ON THIS POINT, 173 F. 2d 747 (C.A. 6, 1949). We believe that petitioner Hibbard's note in 1961 was worth only the $22,000 at which he valued it. Accordingly, we find that Harold and Ethel Hibbard suffered a loss of $4,197.33 on the sale of the Oak Street property rather than $9,924.86 as claimed. The Hibbards on their joint return for 1958 claimed a partnership loss from G.C.T. Distributors and a rental loss from a building in Gary, Indiana. Neither of these losses was substantiated by the evidence and we find that respondent properly disallowed these claimed deductions. Decisions will be entered under Rule 50. Footnotes
1. Petitioners concede some omission of income from this source and that the omission was fraudulent. They contest the amount determined by respondent.↩
*. The South East National Bank, Chicago, Illinois. ↩
**. The Cosmopolitan National Bank of Chicago, Illinois.↩
*. The Cosmopolitan National Bank of Chicago, Illinois.↩
*. Not identified.↩
*. Total amount of check $588.00.↩
**. Total amount of check $423.76↩
***. Total amount of check $4,000.00.↩
****. Total amount of check $2,163.92. ↩
*. Received from Hibbard Dowel Co. per cash receipts journal. ↩
**. Received from Ben Stein per cash receipts journal.↩
2. Petitioners Ben and Sylvia Stein on brief conceded that they received additional income in 1962 and 1963 in the amounts of $10,376.16 and $13,964.57, respectively, from Midwest Maintenance resulting from payments made during these years by that corporation on behalf of Ben Stein.
3. In reaching this conclusion we have considered the testimony of any attorney regarding an argument in his office in June 1960 between Stein and Hibbard in which Stein accused Hibbard of taking money of Hibbard Dowel Co. Assuming that the recollection of this attorney is accurate after a lapse of about 10 years, there is no inconsistency in Stein and Hibbard conniving to defraud the government of income taxes and the two disagreeing on the division of the profits of their connivance. Whatever the rift, if any, it apparently was not long lasting since the two continued their association in Hibbard Dowel Co. thereafter.↩
4. It is noted that Stein also failed to report income in 1961 from his distributive share of the corporate income of Hibbard Dowel Co. This is also an indication of fraud in the year 1961.↩
5. We stated in Henry M. Rodney, 53 T.C. 287 (1969) at page 315: The proof of bank deposits standing alone does not establish the receipt of income. See Goe v. Commissioner, 198 F. 2d 851 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court. However, where from surrounding circumstances it is a fair inference that the deposit is made up of income, it is proper for the Commissioner to make a determination on that ground. See Hague Estate v. Commissioner, 132 F. 2d 775 (C.A. 2, 1943), affirming 45 B.T.A. 104 (1941). There is a presumption that such determinations made by the Commissioner are correct, and the burden falls upon petitioner to prove otherwise. Thomas B. Jones, 29 T.C. 601 (1957), and Axel Holmstrom, 35 B.T.A. 1092↩ (1937).
6. SEC. 163. Interest. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
7. Although petitioners argued on brief that only 60 percent of the insurance expense incurred should be allowable, they were under the misapprehension that the $3,850.23 represented only boat and automobile insurance.